## No. 25082

## The People of the State of Colorado v. James Clifford Wright
(511 P.2d 460)

Decided June 18, 1973.

Duke W. Dunbar, Attorney General, John P. Moore, Deputy, David A. Sorenson, Assistant, for plaintiff-appellee.

Walter L. Gerash, H. D. Reed, for defendant-appellant.

*En Banc.*

MR. JUSTICE DAY delivered the opinion of the Court.

Defendant-appellant, James C. Wright, was convicted by a jury of first-degree murder and sentenced to life imprisonment. He will be referred to as defendant or Wright.

On April 19, 1970, defendant and his parents, Clifford and Essie Wright, had visited relatives in Dove Creek. On their way home, they observed the decedent, Claude Rhoades, and his wife coming from the opposite direction in their pickup truck. There was some difficulty encountered as the cars passed on a narrow and somewhat muddy road. Rhoades turned his truck around and caught up with and overtook the Wright vehicle. Wright claimed that he was run off the road, and that Rhoades pulled in front of his car and stopped the

truck. Rhoades then started back towards Wright's car. Wright remained behind the wheel of his car, but as Rhoades approached, Wright removed a pistol from a pocket in the car and laid it on the seat next to him. According to Wright, Rhoades opened the encounter between the two by making accusations about Wright's meddling in Rhoades' affairs. Rhoades then allegedly made a movement with his right hand toward his right rear pocket. At that instant defendant raised his pistol and pulled the trigger. The shot killed Rhoades instantly.

Decedent's wife, who had been standing a few feet away, moved the truck to allow the Wright car to get by. Wright drove to his home and immediately notified the appropriate authorities of the death. He also called his own attorney, who arrived about the same time as the sheriff and district attorney. Thus, during the investigation, defendant's attorney was present. Defendant and his parents — on advice of counsel — refused to answer questions, but were described as being cooperative in other ways with the sheriff and district attorney.

Defendant at the trial contended he acted in necessary self-defense. There was developed in the evidence a picture, first, of a reasonably friendly and neighborly relationship between Wright and Rhoades, who was married to Wright's cousin, but subsequently a deteriorating relationship between the two. The hostility began in 1965 when Rhoades and Wright's cousin were divorced. It continued to 1970 — the time of the homicide. It was fed by such incidents as defendant's mother's lending money to Rhoades' wife during the divorce proceeding plus contentions that defendant allegedly supplied information to his cousin — who had moved to California — as to Rhoades' farming operations so that her share of the profits might not suffer. Wright claimed that because of the friction of the divorce the decedent had made direct threats to him and had engaged in violent actions towards third persons related to the defendant. Wright also claimed he felt apprehensive and threatened because of decedent's numerous suspicious activities near Wright's resi-

dence. There was substantial other evidence of decedent's violent propensities and his continuing hostility toward the Wrights. This background, Wright claimed, prompted him to place the gun by his side when Rhoades approached him. His fears allegedly surfaced when Rhoades made the claimed movement towards his hip pocket. On the other hand, there was testimony from decedent's wife that the defendant waited for Rhoades to come back from his truck to the Wright car and then shot Rhoades without provocation.

Throughout the trial, in eliciting direct testimony from the sheriff and in questioning defendant's father and mother, as well as in cross-examination of defendant, the district attorney continuously, over objection, alluded to the fact that Wright had not presented his theory of self-defense during the investigation and questioning by the sheriff and district attorney. At numerous times during the trial, the district attorney made direct reference and side-bar arguments concerning defendant's remaining silent and his refusal to answer questions. It was brought out four times on direct examination of the sheriff. In cross-examination of Wright, the district attorney said:

"Did you entertain a reason not to discuss this matter with the authorities that evening? (Objection sustained)

"But in any event you elected to get your attorney out there as fast as possible; wouldn't that be a true statement?

"You didn't relate that to us did you? That's what you wanted. You didn't say anything; you listened to your attorney and you kept your mouth shut; isn't that right?"

During closing argument, among numerous improper comments, the district attorney compounded the prejudice created by his questioning of the witnesses with the following remarks in his summation:

"Now, Ladies and Gentlemen, who's kidding who? You know this fella, James Wright. You know all about him. I don't know what was on Claude Rhoades' mind when he told him to mind his own business.

"I submit that this man comes in here and tells twelve men and women of this county that I shot in self-defense and

makes them believe it, then he's going to beat you to the bank laughing about it.

"The thing that puzzles me, Ladies and Gentlemen, if he meant this self-defense, what was the big secret about telling Mr. Johnson and myself and Melvin Foley that night; this noble act of self-defense that Mr. Dilts is talking about, trying to make you buy. Johnson is a reasonable man. I try to be. No, he called his attorney. Not only wouldn't he talk, but Clifford and Essie wouldn't talk because they were afraid they would incriminate themselves."

I.

■ The primary argument asserted by the defendant is based on his constitutional right against self-incrimination. U.S. Const. amend. V and XIV; Colo. Const. art. II, § 18. Not only does defendant have the right to remain silent, but it is improper for the prosecution to allude to his exercise of that right as indicating a consciousness of guilt.

■ We repeat once again the rule stated by the United Sates Supreme Court in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694:

"* * * In accord with our decision today, it is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. The prosecution may not, therefore, use at trial the fact that he stood mute or claimed his privilege in the face of accusation. * * *"

*See People v. Mingo,* 181 Colo. 390, 509 P.2d 800. *See also Meader v. People,* 178 Colo. 383, 497 P.2d 1010; *Hines v. People,* 179 Colo. 4, 497 P.2d 1258; *Montoya v. People,* 169 Colo. 428, 457 P.2d 397; *Martinez v. People,* 162 Colo. 195, 425 P.2d 299; *American Bar Association Standards of Criminal Justice Relating to the Prosecution Function,* § 5.8.

We cannot condone the prosecutorial activities utilized by the district attorney in this case on any theory, including those based in "traditional methods of cross examination." The only inference to be drawn from such comments and arguments was that the defendant was guilty and that an

honest answer would have incriminated him. The prejudice that results from such activities is of constitutional proportion.

## II.

■ Compounding the district attorney's improper comments on defendant's silence were his comments on his own honesty and integrity as an elected public official and on the veracity and honesty of the sheriff.

In the closing argument are to be found such statements by the prosecutor as:

"I don't have any doubts about it Ladies and Gentlemen: you know your Sheriff, Bob Johnson, your duly elected Sheriff, and the rest of those men who were called upon to perform a job. They had no reason to lie about it. Eldon Leffel didn't lie about it. * * * I want you to believe me. I want you to be the judge of my credibility. I'm an honest man. * * * Now I'll vouch for their veracity and I know that they told you people the truth * * *."

■ As set out in the *American Bar Association Standards of Criminal Justice Relating to the Prosecution Function* § 5.8:

"(b) It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant."

■ We again caution district attorneys against overzealousness in their efforts to convict and who by improper comments impair the conduct of a fair trial. As we said in *People v. Walker,* 180 Colo. 184, 504 P.2d 1098, concerning the role of the district attorney:

"* * * A prosecutor's duty is to seek justice, not merely to convict. *American Bar Association Standards for Criminal Justice Relating to The Prosecution Function and The Defense Function, The Prosecution Function* § 1.1. '[W]hile he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.'

*Berger v. United States,* 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)."

## III.

To avoid uncertainty in the event of a retrial, we comment on the assertion of error in the trial in excluding certain staged photographs depicting a reconstruction of the position of decedent's truck and defendant's car. We hold the court's ruling was proper. The photographs were only offered to lend support to the defendant's testimonial contentions. In these circumstances where an exhibit has been arranged simply to portray a scene and thereby support testimonial contentions, and when other witnesses dispute the accuracy or correctness of the reconstructed scene, trial court should not admit the evidence. *See State v. Ray,* 43 N.J. 19, 202 A.2d 425; *State v. Oldham,* 92 Idaho 124, 438 P.2d 275. Of course, if the parties agree the exhibit correctly portrays the scene, the reconstruction may be admitted.

The judgment is reversed, and the cause is remanded for a new trial.

MR. CHIEF JUSTICE PRINGLE and MR. JUSTICE ERICKSON do not participate.