23CA0994 Peo v Martinez 10-09-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA0994
Arapahoe County District Court No. 22CR83
Honorable Darren L. Vahle, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Dominic Jorge Martinez,

Defendant-Appellant.

---

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division II
Opinion by JUDGE FOX
Brown and Meirink, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced October 9, 2025

---

Philip J. Weiser, Attorney General, Brittany Limes Zehner, Senior Assistant Attorney General and Assistant Solicitor General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Chloe Sovinee-Dyroff, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Dominic Jorge Martinez appeals his conviction for second degree assault.  We reverse and remand the case for a new trial.

## I.     Background

¶ 2     In January 2022, in Aurora, eighteen-year-old Martinez had an argument with his mother and his stepfather, Francisco Samora. The argument resulted in Martinez stabbing his stepfather.[1] Martinez then left his family's home where the stabbing occurred and walked until he found a police car.  He told the officers he stabbed his dad.[2]  Martinez explained that his mother came into his room, they argued, and she started yelling at and hitting him.  His stepfather then came into the room and also started yelling and hitting him.

¶ 3     Martinez told Officer Gary Oliver that, about six months prior, he had been stabbed in one of his eyes, and he "thought [he] was gonna get stabbed in [his] other eye, so [he] stabbed [his] dad."[3]  He

---

[1] Because Martinez and his sister share a last name, and for ease of identification and readability, we refer to Martinez's family members by their relationship to him, rather than their first or last names.
[2] Although Samora was Martinez's stepfather, Martinez called Samora his dad at trial and when speaking to police.
[3] The injury (caused by an accident with a friend) was significant enough to require a prosthetic eye.

also explained that he stabbed his stepfather "to get away" and then "ran out of the house . . . and went to look for an officer."  Martinez repeatedly told Oliver that he did not mean to stab his stepfather and explained that he had "anger issues and impulses," struggled with marijuana dependency, and experienced mental health issues.

¶ 4    Martinez's first degree assault charge was tried to a jury in 2023.  At trial, Martinez, his mother, and his sister testified. Martinez testified to largely the same version of events that he told Oliver.  However, whereas he told Oliver he had never been in a fight with his stepfather before and that his stepfather had not previously physically assaulted him, he testified at trial that both parents had been violent towards him in the past.  He also testified that his stepfather had hit him hard, which conflicted with his statements to Oliver.  Martinez's recollection at trial was generally more detailed than his account to Oliver.  He explained at trial that he did not tell Oliver "the extent of [his] parents hitting [him]" because he "didn't want anybody to get in trouble."

¶ 5    Martinez's mother testified that she had hit Martinez before, hit him on the day of the incident, and that Martinez's stepfather had also hit him that day.  Martinez's mother also admitted that

2

she initially told police that Martinez was not involved in the stabbing. Martinez's sister similarly testified that Martinez's parents were hitting him when the stabbing occurred. And, as with Martinez's mother, his sister admitted she was initially dishonest with police by implicating a stranger, rather than Martinez, in the stabbing.

¶ 6    At trial, the prosecution also introduced recordings of jail calls between Martinez and his mother. In the calls, Martinez and his mother discussed the version of events they would give the district attorney (DA) and discussed ensuring that their accounts were consistent. For example, in one of the calls, Martinez asked his mother to "go over the story" she would tell the DA. He then described a version of events in which had the knife because he was peeling potatoes, adding, "If we all tell the same story . . . that should be good for the charges." He also said, "It would look better if you guys said that [my stepfather] was getting aggressive because that would help . . . with my self-defense."

¶ 7    The jury convicted Martinez of second degree assault pursuant to section 18-3-203(1)(b), C.R.S. 2025. But it found that he was acting upon a provoked "sudden heat of passion," which reduced

3

the class of felony associated with his conviction. § 18-3-203(2)(a), (b). He was sentenced to eighteen months with work release and four years of probation. This appeal followed.

¶ 8 Martinez raises several issues on appeal. First, he argues that the trial court's reasonable doubt instruction impermissibly lowered the prosecution's burden of proof. He also contends that the prosecutor made various improper statements throughout trial. The instruction was proper, but we conclude that several of the prosecutor's statements warrant reversal. Therefore, we need not address the remaining issues related to the prosecutor's comments.

II.    The Reasonable Doubt Instruction

¶ 9 Martinez contends that the trial court gave a reasonable doubt instruction that lowered the prosecution's burden of proof, which he argues constituted structural error requiring reversal. We disagree.[4]

---

[4] Although we reverse Martinez's conviction on other grounds, we reach his challenge to the jury instruction because the current model instruction is largely the same as the version given at his trial, so the issue is likely to arise on remand.

## A. Additional Background

¶ 10    Before 2022, and as relevant here, the model criminal jury instructions defined proof beyond a reasonable doubt as follows:

> Reasonable doubt means a doubt based upon reason and common sense which arises from a fair and rational consideration of all of the evidence, *or the lack of evidence,* in the case. It is a doubt which is not a vague, speculative or imaginary doubt, but *such a doubt as would cause reasonable people to hesitate to act in matters of importance to themselves.*
>
> If you find from the evidence that each and every element of a crime has been proven beyond a reasonable doubt, you should find the defendant guilty . . . . If you find from the evidence that the prosecution has failed to prove any one or more of the elements of a crime beyond a reasonable doubt, you should find the defendant not guilty . . . .

COLJI-Crim. E:03 (2021) (emphases added).

¶ 11    The revised 2022 model instruction, in pertinent part, defined reasonable doubt as follows:

> Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. If you are firmly convinced of the defendant's guilt, then the prosecution has proven the crime charged beyond a reasonable doubt. But if you think *there is a real possibility that the defendant is not guilty,* then the prosecution has failed to prove the crime charged beyond a reasonable doubt.

5

COLJI-Crim. E:03 (2022) (emphasis added). The instruction then directed the jury to "consider[] all the evidence" when deciding whether the prosecution proved or failed to prove all the elements beyond a reasonable doubt. *Id.*

¶ 12     At Martinez's trial, over the defense's objection, the court gave the 2022 model instruction. That version (1) omitted language instructing the jury to consider "the lack of evidence," (2) omitted language defining a reasonable doubt as one that "would cause reasonable people to hesitate to act in matters of importance to themselves," and (3) added language instructing the jury to acquit if "there is a real possibility that the defendant is not guilty." These changes, Martinez argues, lowered the prosecution's burden of proof.[5]

---

[5] The 2023 model instruction added a sentence explaining that "[a] reasonable doubt can be based on the evidence presented or the lack of evidence presented." COLJI-Crim. E:03 (2023). This model instruction was not yet available at Martinez's trial because the model instructions' publication year does not correspond with the edition year. *See* Colo. Jud. Branch, Model Crim. Jury Instructions Comm., *Colorado Jury Instructions—Criminal (2024)* (2025), https://perma.cc/DF4R-ALTN (publishing the 2024 edition in February 2025).

## B. Standard of Review and Applicable Law

¶ 13      We review de novo whether a trial court accurately instructed the jury on the law. *Tibbels v. People*, 2022 CO 1, ¶ 22. The reasonable doubt standard implicates a defendant's constitutional rights, *see id.* at ¶¶ 23-24, and "[i]nstructions that lower the prosecution's burden of proof below th[is] . . . standard constitute structural error and require automatic reversal," *id.* at ¶ 22.

¶ 14      Trial courts have some leeway to define reasonable doubt. *Johnson v. People*, 2019 CO 17, ¶ 10 (citing *Victor v. Nebraska*, 511 U.S. 1, 5 (1994)). Nevertheless, the prosecution must prove the elements of each crime beyond a reasonable doubt, and instructions that lower this burden violate a defendant's due process rights. *Id.* at ¶ 13. To determine whether an instruction unconstitutionally lowered the prosecution's burden of proof, we consider "whether there is a reasonable likelihood that the jury understood a contested instruction, in the context of the instructions as a whole and the trial record, to allow a conviction based on a standard lower than beyond a reasonable doubt." *Tibbels*, ¶ 36. Finally, model jury instructions are guidelines; they

are not binding, nor are they automatically proper.  *People v. Schlehuber*, 2025 COA 50, ¶ 14.

¶ 15     Although our supreme court has not yet considered the instruction at issue here, two divisions of this court recently addressed challenges to the same model instruction.  *Id.* at ¶ 7; *People v. Melara*, 2025 COA 48, ¶¶ 10-32.  Additionally, as discussed below, many of the federal circuit courts have considered challenges to similar instructions.  Together, this jurisprudence informs our decision.

## C.     Lack of Evidence

¶ 16     Martinez first contends that the 2022 model instruction lowered the burden of proof by failing to inform the jury that it could consider the evidence presented and the *lack* of such evidence.  Courts have approved of instructions directing juries to consider a lack of evidence.  *E.g.*, *Melara*, ¶ 24; *People v. Rubio*, 222 P.3d 355, 363 (Colo. App. 2009) ("The instruction that reasonable doubt can [also] arise . . . from [a] 'lack of evidence' strengthens rather than undercuts the presumption of innocence."); *Johnson v. Louisiana*, 406 U.S. 356, 360 (1972) (discussing the many cases that define reasonable doubt as "aris[ing] from the evidence or lack

of evidence" (citations omitted)), *abrogated by, Ramos v. Louisiana*, 590 U.S. 83 (2020).

¶ 17    But Martinez cites no case in which a court held that failing to instruct the jury that it could consider a lack of evidence lowered the burden of proof. *Cf. Melara*, ¶ 24 (holding that courts "should inform the jury . . . that it may consider the lack of evidence," but failing to do so does not impermissibly lower the burden of proof); *Schlehuber*, ¶ 20 & n.3 (holding that omitting such language is not error and noting that "[a]t least six federal courts of appeals have held that a court does not err by omitting an explicit reference to the lack of evidence," and the division was unaware of any case finding reversible error).

¶ 18    We agree with our sister divisions that "the absence of an express instruction to consider the lack of evidence is not tantamount to a prohibition on doing so." *Schlehuber*, ¶ 21 (quoting *Melara*, ¶ 32). Therefore, even if the court erred by failing to provide an instruction with the "lack of evidence" language, any error did not impermissibly lower the prosecution's burden of proof. *See Tibbels*, ¶ 36.

## D.     Hesitate to Act

¶ 19     Next, we reject Martinez's contention that the 2022 model instruction impermissibly lowered the burden of proof by omitting the 2021 model instruction's definition of reasonable doubt as one that "would cause reasonable people to hesitate to act in matters of importance to themselves."  COLJI-Crim. E:03 (2021).

¶ 20     Federal and Colorado courts have approved of instructions using the "hesitate to act" language.  *E.g.*, *Victor*, 511 U.S. at 20-21; *see also United States v. Reese*, 33 F.3d 166, 171-72 (2d Cir. 1994) (suggesting that the "hesitate to act" language is preferable to instructing juries to acquit based on "a real possibility that [a defendant] is not guilty"); *People v. Alvarado-Juarez*, 252 P.3d 1135, 1137 (Colo. App. 2010).

¶ 21     But this language has also been criticized as unhelpful and confusing.  *See Victor*, 511 U.S. at 24-25 (Ginsburg, J., concurring); COLJI-Crim. E:03 cmt. 1 (2022) (citing criticism of the "hesitate to act" language as one rationale for omitting it from the 2022 model instructions); *United States v. Noone*, 913 F.2d 20, 29 (1st Cir. 1990) (describing similar language as an "unnecessary embellishment that risks juror misunderstanding").  And

*Schlehuber*, ¶ 28, rejected an identical challenge to the one here, concluding that it was not error to omit the "hesitate to act" language "so long as the instruction otherwise correctly defines the reasonable doubt standard."

¶ 22     "[O]ther than pointing out that courts have previously approved this language," Martinez cites no authority holding that "it is error *not* to include it."  *Id.*  We are aware of no controlling authority requiring this language, and the fact that an instruction correctly states the law "does not mean the instruction must be given or that it is the *only* correct way to articulate the applicable law."  *Id.*  We therefore conclude that omitting the "hesitate to act" language from the reasonable doubt instruction did not lower the prosecution's burden of proof.  *See Tibbels*, ¶ 36.

### E.     Real Possibility

¶ 23     Martinez's final contention regarding this instruction is that instructing the jury to acquit if "there is a *real possibility* that the defendant is not guilty" diluted the presumption of innocence, shifted the burden of proof, and risked confusing the jury. (Emphasis added.)  We disagree.  The "real possibility" language "correctly directs the jury not to acquit . . . simply because it can

11

conceive of some fanciful possibility that the defendant is not guilty." *Schlehuber*, ¶ 31. And this language does not shift the burden of proof to the defendant because "[n]othing in th[e] phrase suggests that the defendant must" prove that real possibility. *Id.* at ¶ 34.

¶ 24    Martinez cites two federal cases disapproving of this wording — *United States v. Porter*, 821 F.2d 968, 973 (4th Cir. 1987) (noting that the trial court inadequately distinguished a "possibility" from a "real possibility" and that the defendant had no burden to prove "a 'real possibility' of innocence"), and *United States v. McBride*, 786 F.2d 45, 51-52 (2d Cir. 1986) (explaining that the "real possibility" language may cause confusion or "be misinterpreted . . . as unwarrantedly shifting the burden of proof"). But both circuits concluded that this language did not constitute reversible error. *Porter*, 821 F.2d at 973; *McBride*, 786 F.2d at 52. And many circuits have found no error in instructions with this language. *E.g.*, *United States v. Williams*, 20 F.3d 125, 131 (5th Cir. 1994); *United States v. Artero*, 121 F.3d 1256, 1258 (9th Cir. 1997); *United States v. Conway*, 73 F.3d 975, 980 (10th Cir. 1995); *see*

*also Victor*, 511 U.S. at 27 (Ginsburg, J., concurring) (approving of a model instruction with the "real possibility" language).

¶ 25 Against this backdrop, we reject Martinez's argument that the "real possibility" language was improper. We also reject his argument that a real possibility is subjective and that failing to define it could cause confusion or lead to inconsistent results. A real possibility is no more subjective than the kind of doubt that "would cause reasonable people to hesitate to act in matters of importance to themselves." COLJI-Crim. E:03 (2021); s*ee Castillo v. State*, 913 S.W.2d 529, 534 (Tex. Crim. App. 1995) ("To the extent that reasonable persons may entertain different thresholds of hesitation in acting in the most important of their own affairs, . . . the law . . . recognize[s] a range of 'reasonable doubt.'"). Therefore, the trial court did not err by giving the 2022 model instruction.

### III.   The Prosecutor's Statements

¶ 26 Martinez next argues that the prosecutor made numerous improper comments that he contends warrant reversal on various grounds. We conclude that it was plain error for the prosecutor to suggest that Martinez did not (but should have) raised a

self-defense argument before trial. Therefore, we need not consider his remaining arguments about prosecutorial misconduct.

## A. Standard of Review

¶ 27    To determine whether a prosecutor engaged in misconduct, we conduct a two-step inquiry. "First, we determine whether the prosecutor's conduct was improper based on the totality of the circumstances." *People v. Licona-Ortega*, 2022 COA 27, ¶ 85 (citing *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010)). We then "decide whether the misconduct warrants reversal under the applicable standard." *Id.* "Factors to consider when determining the propriety of statements include the language used, the context in which the statements were made, and the strength of the evidence supporting the conviction*." People v. Vialpando*, 2022 CO 28, ¶ 21 (citation omitted).

¶ 28    We review unpreserved claims of prosecutorial misconduct for plain error. *Licona-Ortega*, ¶ 88. "To constitute plain error, any prosecutorial misconduct must be obvious and 'must be flagrant or glaring or tremendously improper, and it must so undermine the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction.'" *Id.* (citation omitted).

14

"Prosecutorial misconduct in closing argument rarely constitutes plain error." *People v. Smalley*, 2015 COA 140, ¶ 37.

### B. Martinez's Failure to Raise Self-Defense Before Trial

#### 1. Additional Background

¶ 29 Oliver, who spoke with Martinez after the incident, testified at trial. The prosecution played footage from Oliver's body camera containing his conversation with Martinez.[6] The prosecutor asked Oliver several questions about Martinez's statements, including whether Martinez said (1) "he stabbed his dad because his parents were brutally beating him"; (2) "his parents were tossing him around like a rag doll"; (3) "he . . . saw his dad's knee near his face"; (4) "his mother hit him four times"; (5) his mother had hit him before and once wrapped an electrical cord around his neck; and (6) one of his parents pulled his hair out. Oliver responded either in the negative or said he did not recall Martinez making the statements. Defense counsel did not object. Later, when Martinez testified, the prosecutor asked him the following questions:

---

[6] Exhibit 4, the body camera footage of Martinez and Oliver's conversation, was admitted at trial. Necause it is unclear exactly which portions of the exhibit were played for the jury, we consider the exhibit in its entirety.

15

Q: . . . Mr. Martinez, you never told the police that you acted in self-defense?

A: No. I didn't even know that was the law before this.

Q: You didn't know that self-defense was the law?

A: No.

Q: Okay. You never told police, at all, that you feared for your life before the stabbing occurred?

A: I didn't. . . .

Q: You never told Officer Oliver that you believed you were going to die?

Later, the following exchange occurred:

Q: And after you got out of jail — or at any point up until this Monday, you never told . . . any officers that you were acting in self-defense, right?

A: No. I didn't know that was a thing.

Q: Okay. So even after you were released — after we heard this call where you talked about self-defense — you didn't go to the police and say "I was acting in self-defense"?

. . . .

Q: So today is the first time you are ever telling law enforcement — such as the DA's office — that you were acting in self-defense, right?

In closing arguments, the prosecutor said,

> And then we hear this self-defense idea.  Self-defense is — he never told police . . . .  And then not telling the police, not saying anything on the jail calls, for the very first time . . . [Martinez] started to say that his mom was one of the main aggressors too.

Defense counsel objected to "burden shifting."

¶ 30    In rebuttal, the prosecutor argued, "When [Martinez] got up here, this self[-]defense claim . . . was the first time that he had ever reported it to police . . . [or] to the DA's office.  He had th[e] opportunity to, though.  There's nothing that stopped him from calling the police or calling the DA's office . . . ."  The defense objected on the same ground of burden shifting.

### 2.    The Prosecutor Engaged in Misconduct

¶ 31    Martinez argues that the prosecutor's statements that he did not assert self-defense before trial mischaracterized the evidence, improperly shifted the burden to Martinez to prove his self-defense claim, and impermissibly commented on his silence.  We agree that several of these comments violated Martinez's constitutional rights. *See Doyle v. Ohio*, 426 U.S. 610, 611 (1976) (The prosecution violates due process when it "seek[s] to impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining

the defendant about his failure to have told the story after receiving" warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).); *People v. Wright*, 511 P.2d 460, 461-62 (Colo. 1973) (the prosecutor violated the defendant's "constitutional right against self-incrimination" by commenting on his failure to tell police that he acted in self-defense).

¶ 32    Defendants have a constitutional right to remain silent, and "it is improper for the prosecution to allude to [the] exercise of that right as indicating a consciousness of guilt." *Wright*, 511 P.2d at 462. However, "a different rule applies if a defendant makes a post-*Miranda* statement and then testifies at trial to a different version of events." *People v. Castro*, 2022 COA 101, ¶ 32 (citation omitted). If this occurs, "the prosecution may cross-examine the defendant on inconsistencies between the two statements. And, the prosecution also may cross-examine the defendant on omissions in the first statement insofar as such omissions are inconsistent with the defendant's testimony at trial." *Id.* (citation omitted); *see People v. Hardiway*, 874 P.2d 425, 427 (Colo. App. 1993) (a prosecutor may impeach a defendant who omits "significant details from an initial statement" but testifies to those details at trial (citing *People v.*

18

*Quintana*, 665 P.2d 605, 610 n.7 (Colo. 1983)). The types of "significant details" on which a defendant may be impeached include omissions that "fail[] to mention a material circumstance presently testified to, which it would have been natural to mention in the prior statement." *Hardiway*, 874 P.2d at 427 (citation omitted). But if a defendant's trial testimony "merely augment[s] that which was originally described, the prior silence is often simply too ambiguous to have any probative force" and is not a proper subject for impeachment on grounds of inconsistency. *Castro*, ¶ 33 (citation omitted).

¶ 33    In *Hardiway*, the defendant "spoke with the officer briefly, but then invoked her right to remain silent." 874 P.2d at 427. She later "testified to a more detailed version of events and, during cross-examination, the prosecutor asked why she" did not tell police "th[e] more elaborate version." *Id.* Because her "more elaborate trial testimony merely augmented her initial statement," the division held that the omissions were not proper inconsistent statements and concluded that the error was not harmless. *Id.* at 428. It reasoned that the prosecutor "did more than merely allude to or unintentionally evoke testimony relating to the fact of [the]

19

defendant's custodial silence" but instead used Hardiway's "silence as a means of implying guilt in both cross-examination and rebuttal argument." *Id.*

¶ 34    In *Wright,* our supreme court found reversible error where — during the direct examination of several witnesses and the defendant's cross-examination — "the [prosecutor] continuously, over objection, alluded to the fact that Wright had not presented his theory of self-defense during the investigation." 511 P.2d at 461, 463.  For example, in closing, the prosecutor argued, "[I]f he meant this self-defense, what was the big secret about telling [the authorities] that night . . . .  No, he called his attorney.  Not only wouldn't he talk, but" other witnesses also refused to talk.  *Id.* at 462.  The supreme court held that "[t]he only inference to be drawn from" the prosecutor's statements "was that the defendant was guilty and that an honest answer would have incriminated him," and the resulting prejudice was "of constitutional proportion."  *Id.*; *see also People v. Ortega,* 597 P.2d 1034, 1035-36 (Colo. 1979) (holding that it was plain error for the prosecutor to argue that the defendant should have elaborated on his statements to police and offered exculpatory information).

¶ 35    More recently, a division of this court held that impeaching a defendant's inconsistent statements does not allow prosecutors to "present evidence suggesting that a defendant should have affirmatively offered an exculpatory statement to law enforcement." *People v. Cuellar*, 2023 COA 20, ¶ 48. In *Cuellar*, a sexual assault case, the prosecutor elicited testimony that Cuellar invoked his right to counsel when speaking to police, he never told police he and the victim engaged in consensual sex, and he never contacted police "to offer such a statement." *Id.* at ¶¶ 31, 34. The division first concluded that the prosecutor could elicit testimony that Cuellar never told police the sex was consensual because his statements were inconsistent; he initially denied having sex with the victim but later asserted a consent defense at trial. *Id.* at ¶¶ 8, 11, 46, 47. However, the division held that the court erroneously allowed testimony that Cuellar invoked his rights and never contacted police to explain the sex was consensual. *Id.* at ¶ 49.

¶ 36    Concluding that the errors were not reversible, the division reasoned that the statements were not made to imply guilt, and they "were brief, were not the focus of the prosecutor's comments or . . . the [witnesses'] testimony, and were not repeated in closing

21

argument." *Id.* at ¶ 51.  Additionally, there was overwhelming evidence contesting Cuellar's consent defense.  *Id.* at ¶¶ 52-53.

¶ 37     In *Castro,* ¶¶ 7-8, the defendant also asserted a consent defense to a sexual assault charge.  He initially refused to speak to police but later told officers that the encounter was consensual.  *Id.* at ¶ 12.  At trial, his testimony was more detailed than his statements to police, and the prosecutor asked, "Did you tell that deputy . . . everything you just told us here this morning?"  *Id.* at ¶¶ 13-14 (alteration in original).  The prosecutor then asked if Castro "ever [thought] to talk to law enforcement and . . . [share] [his] side of the story . . . ?"  *Id.* at ¶ 16.  And in closing, the prosecutor said, "He was given the opportunity, not once but twice, to talk to law enforcement."  *Id.* at ¶ 18.

¶ 38     Unlike in *Cuellar,* the *Castro* division concluded that the prosecutor's comment and cross-examination were improper because Castro's statements were consistent; he told police and testified that the encounter was consensual, and the details he added at trial did not give the prosecution license to probe "why those details were missing from the original statement."  *Id.* at ¶¶ 34-35; *cf. People v. Davis*, 312 P.3d 193, 200-01 (Colo. App.

2010) (no error where the defendant said he told police everything, and the prosecutor referenced his more comprehensive trial testimony), *aff'd*, 2013 CO 57. And the *Castro* division concluded that the error was not harmless in part because the evidence of guilt "was not overwhelming," and "the case turned on Castro's credibility." *Castro*, ¶¶ 43, 44.

¶ 39 Here the prosecutor engaged in misconduct by repeatedly referencing Martinez's failure to raise self-defense before trial. Martinez made several pretrial statements that were inconsistent with his testimony, which the prosecutor could have (and did) ask about. But it was not inconsistent for Martinez to assert self-defense at trial without using those exact words when speaking to Oliver. Martinez's initial statements and his testimony reflected that he stabbed his stepfather because his parents were yelling at and hitting him, and he was afraid of losing his good eye; he effectively explained that he believed he acted in self-defense (without using those words).

¶ 40 For example, Martinez told Oliver, "I didn't mean to stab him, but [my parents] were just yelling at me and then they started hitting me . . . ." He later said that when his parents were hitting

23

him, he stabbed his stepfather because he was concerned about being stabbed in his good eye. When asked what was happening when he stabbed his stepfather, Martinez said, "He was going to hit me." He also said he stabbed his stepfather "to get away." When asked why he pulled out a knife, he said, "[T]hey were just yelling at me, and my mom smacked me, but that's like pretty normal . . . and then my dad got some hits in, too."

¶ 41 True, Martinez recounted less violence to Oliver than in his trial testimony and told Oliver his parents "were treating him like they should" and that hitting one's children was "pretty normal." He also responded, "I don't know. It was an impulse," when asked why he stabbed his stepfather. These statements may have constituted proper grounds for impeachment, but the prosecutor's emphasis on Martinez not telling police or the prosecution before trial that he acted in self-defense improperly and repeatedly "suggest[ed] that [Martinez] should have affirmatively offered an exculpatory statement to law enforcement." *Cuellar*, ¶ 48. The prosecutor's rebuttal argument also mirrored the improper argument in *Castro*, ¶ 18, where the prosecutor asserted that Castro could have spoken to law enforcement before trial.

24

¶ 42    And though Martinez's trial testimony added details about his parents' past violence, the extent of their violence during the incident, and his mother's involvement, his testimony — as it related to self-defense — was not inconsistent with his statements to Oliver overall.  That he did not explicitly use the words "self-defense" when speaking to Oliver and did not subsequently volunteer such an explanation to law enforcement or the prosecution before trial was not an omission of a "material circumstance . . . [that] would have been natural to mention" to police.  *Hardiway*, 874 P.2d at 427 (citation omitted).

¶ 43    We acknowledge that this case differs from *Hardiway* and *Castro*, where the defendants "spoke only briefly . . . after having been arrested and advised of [their] rights."  *Castro*, ¶ 31 (citing *Hardiway*, 874 P.2d at 427); *cf. People v. Lewis*, 2017 COA 147, ¶ 36 (distinguishing *Ortega*, 597 P.2d at 1035, on the basis that "Lewis did not make a brief statement, answer only some questions, or volunteer only limited statements").  Because Martinez spoke to Oliver at length, the prosecutor could properly "contrast[] what [Martinez] said with what he had not said."  *Lewis*, ¶¶ 33, 37 (finding no error where "the prosecutor talked about how Lewis had

volunteered lots of information during the interview but never blamed himself or categorically denied" certain facts).

¶ 44     Thus, the prosecutor could, for example, ask Martinez if he told Oliver he believed he was going to die and about the fact that Martinez had primarily implicated his stepfather when he had spoken to police, whereas his trial testimony included more details about his mother's involvement.  What the prosecutor could not do, however, is repeatedly assert that Martinez's failure to use the words "self-defense" implied guilt.  *See Cuellar*, ¶ 48; *Ortega*, 597 P.2d at 1035-36; *Wright*, 511 P.2d at 462.  Indeed, the State admits that "the prosecution encouraged the jury not to believe Martinez's self-defense theory because" trial was "the first time . . . he ever reported" self-defense to authorities.

¶ 45     We also reject the State's argument that these comments did not infringe on Martinez's rights because he voluntarily spoke to Oliver.  *See Anderson v. Charles*, 447 U.S. 404, 408 (1980) ("[A] defendant who voluntarily speaks after receiving *Miranda* warnings . . . has not remained silent . . . .").  "'[T]he mere fact that [Martinez] . . . answered some questions or volunteered some statements . . . [did] not deprive him of his right to refrain from . . .' volunteering

further . . . exculpatory information." *Ortega*, 597 P.3d at 1034 (quoting *Miranda*, 384 U.S. at 445). And as we explained, a defendant's choice to speak to police does not end the inquiry.

¶ 46 Finally, the prosecutor's questions to Oliver, which Martinez challenges for the first time on appeal, did not implicate Martinez's failure to raise self-defense before trial. And although Oliver testified before Martinez, so his testimony could not properly be construed as highlighting Martinez's omissions or prior inconsistent statements, we conclude that any error was not plain. Martinez testified that his mother had hit him before, he saw his stepfather's knee near his face, his mother hit him "five times or less," and his mother pulled his hair. But he did not relay these details to Oliver. Compared to his statements to Oliver, Martinez's trial testimony also suggested a more violent encounter. Thus, the prosecutor could have properly called Oliver in rebuttal to testify about these omissions. Moreover, the jury heard portions of Oliver and Martinez's conversation. So even without Oliver's testimony, the jury heard that Martinez's statements to Oliver were substantially less detailed than his trial testimony.

¶ 47    In sum, we conclude that the prosecutor's conduct was improper only with respect to his statements and questions to Martinez that specifically referenced Martinez's failure to raise self-defense before trial.

### 3.    The Misconduct Warrants Reversal

¶ 48    Although Martinez objected to some of the challenged statements at trial, he did so only on the ground that they improperly shifted the burden of proof.  He raises the same argument on appeal, but we determine that the error implicated his right to silence, not the burden of proof.  Martinez did not raise his right to silence at trial, and none of the cases discussed above held that similar comments shifted the burden of proof.  *See also Phillips v. People*, 2019 CO 72, ¶ 12 ("[T]o preserve a claim for review on appeal, the party claiming error must have supplied the right ground for the request." (citation omitted)); *People v. Tallent*, 2021 CO 68, ¶ 12 (reviewing for plain error "[w]hen a party presents a new argument or alters the grounds for an objection on appeal").  Therefore, we review for plain error.  *Licona-Ortega*, ¶ 88.

¶ 49    A prosecutor's reference to a defendant's exercise of his right to remain silent does not necessarily require reversal.  *People v.*

*Burnell*, 2019 COA 142, ¶ 45. "Reversal is only required where the prosecutor's comment . . . creates an inference of guilt or where the prosecutor argues that the defendant's silence constituted an implied admission of guilt." *Id.* To evaluate the effect of an improper comment on a defendant's silence, we may consider several factors: "(1) the prosecutor's use of the post-arrest silence; (2) which party elected to pursue the line of questioning; (3) the quantum of other evidence of guilt; (4) the intensity and frequency of the reference; and (5) the trial court's opportunity to grant a . . . mistrial or to give curative instructions." *Castro*, ¶ 40.

¶ 50     We conclude that the statements here warrant reversal. First, "the only inference to be drawn from" the comments about Martinez's failure to raise self-defense earlier "was that [he] was guilty." *Wright*, 511 P.2d at 462; *see Burnell*, ¶ 45. The prosecutor used Martinez's post-arrest silence to "indirectly imply his guilt" by suggesting "that an innocent person would have talked with the police sooner and in more detail." *Castro*, ¶ 41. The comments also implied that Martinez was lying about acting in self-defense. *Id.*

¶ 51     Second, "the prosecut[or] . . . injected the issue into the case on cross-examination . . . and in closing argument." *Id.* at ¶ 42.

¶ 52    Third, the evidence negating self-defense was not overwhelming. *Id.* at ¶ 43. Martinez, his mother, and his sister all testified that Martinez's parents were hitting him and yelling at him when he stabbed his stepfather. Martinez's statements to Oliver corroborated this testimony, and he also told Oliver and testified at trial that he reacted out of fear for the safety of his good eye. Therefore, as in *Castro,* ¶ 44, "the case turned on [Martinez's] credibility" — particularly because his self-defense claim hinged on whether he reasonably believed (1) his stepfather was using or about to use "unlawful physical force" and (2) the degree of force he used was necessary, § 18-1-704(1), C.R.S. 2025.

¶ 53    Fourth, the improper comments were pervasive and repeated throughout trial. *Castro,* ¶ 40. Four times during cross-examination, the prosecutor asked Martinez whether he told police or the DA before trial that he had acted in self-defense. In closing and rebuttal, the prosecutor also referenced Martinez's failure to raise self-defense. Unlike *Cuellar,* ¶ 51, where the division found the errors harmless or not plain, the statements here were made to imply Martinez's guilt, they were not brief, they were a focus of Martinez's cross-examination, and they "were . . . repeated in

30

closing argument" multiple times.  Lastly, because Martinez did not object, we do not consider the court's failure to give a curative instruction.  *Castro*, ¶ 40.

¶ 54 We conclude that this case presents one of the rare instances in which reversal is required under plain error review.  *See Ortega*, 597 P.2d at 1035-36 (concluding that similar comments constituted plain error).  First, the errors were obvious, *Licona-Ortega*, ¶ 88, because our supreme court has explicitly found error where a prosecutor "allude[d] to the fact that [a defendant] did not present his theory of self-defense during [an] investigation," *Wright*, 511 P.2d at 461, 463.  They were also flagrant and glaring given the number of times the comments were repeated throughout trial.  *Id.*

¶ 55 And the errors, which violated Martinez's constitutional rights, undermined the fairness of his trial and "cast serious doubt on the reliability of . . . [his] conviction."  *Licona-Ortega*, ¶ 88.  A prosecutor's position as a representative of the State means that his or her "argument[s] [are] likely to have significant persuasive force with the jury."  *Domingo-Gomez v. People*, 125 P.3d 1043, 1049 (Colo. 2005) (citation omitted).  Additionally, "jurors may attach undue significance to the failure to provide an exculpatory version

of events, creating a substantial risk of prejudice." *People v. Glover*, 559 N.Y.S.2d 518, 520 (App. Div. 1990) (explaining that the "use of a defendant's pre-trial silence" is not harmless error). Here, there was a significant likelihood that the jury assigned undue weight to the prosecutor's repeated comments implying Martinez's guilt from his failure to use the words "self-defense" before trial.

¶ 56 Moreover, Martinez was young, experiencing mental health challenges, and appeared to be relatively unsophisticated. *See People v. Kutlak*, 2016 CO 1, ¶ 24 ("[S]uspects 'may not be legally sophisticated or paragons of clarity in their use of language.'" (citation omitted)); *Gallegos v. Colorado*, 370 U.S. 49, 54 (1962) (Young defendants often do not "know how to prote[c]t [their] own interests or how to get the benefits of [their] constitutional rights."). The prosecutor's repeated emphasis on Martinez's failure to use specific language was therefore more prejudicial than it would have been if Martinez were older and more sophisticated.

## IV. Disposition

¶ 57 The judgment of conviction is reversed, and the case is remanded for a new trial.

JUDGE BROWN and JUDGE MEIRINK concur.