22CA0465 Peo v Simpson 04-16-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA0465
El Paso County District Court No. 20CR2604
Honorable Frances Johnson, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Laurence William Simpson,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE FOX
Kuhn and Sullivan, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 16, 2026

Philip J. Weiser, Attorney General, Paul Koehler, Senior Counsel, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Emily Hessler, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Laurence William Simpson, appeals his convictions for attempted first degree murder and child abuse.  We affirm.

## I.    Background

¶ 2    In the spring of 2019, Simpson, a Pennsylvania resident, planned a summer trip to Colorado Springs with his ten-year-old twins, C.S. and D.S.  Two years earlier, Simpson had separated from his wife and the twins' mother, A.D.  Before the vacation, Simpson discussed his plans with A.D. and told her he intended to fly to Colorado and rent a car for the return trip.  On June 7, 2019, Simpson and the children flew to Colorado.  During the trip, he sent A.D. regular updates.

¶ 3    Near the end of the trip, Simpson made "milkshakes" using ice cream, Gatorade, and strawberries.  But they tasted bad, and the children refused to drink them.  C.S. only took a sip, and D.S. testified that he drank "one to two ounces."  At trial in 2021, the children vaguely remembered Simpson telling them to finish the shakes.  D.S. testified that he was able to drink a bit more after Simpson added more ice cream.  C.S. was less certain that there had been a second or "improved" shake.  Ultimately, Simpson or the children poured the shakes out.

¶ 4    D.S. testified that Simpson then gave him and C.S. "vitamins or pills," but he did not know what the pills were.  D.S. swallowed one pill but spit the rest out.  C.S. did not testify about the pills. The children testified that they felt normal that evening and the next day.

¶ 5    At around 2:45 a.m. on June 13, 2019, Simpson called A.D. in "total despair."  Simpson shared that he had quit his job after telling his boss he was terminally ill, had no money because he spent it on the trip and had "racked up credit card debt," and he did not know how to get himself and the children home.  A.D. then arranged return flights, and Simpson and the children arrived after midnight on June 14.

¶ 6    Later that day, Simpson — hyperventilating and in tears — called his friend B.M.  B.M. testified that Simpson said, "[H]e gave up" and "dissolved pain medicine in the kids' shakes."  B.M. also recalled Simpson saying that after the children refused to drink the shakes, Simpson grabbed the shakes and "kind of snapped to it and got the shakes and dumped them."  B.M. later told A.D. what Simpson had said, and A.D. called the police.

¶ 7    A.D. took the children to get blood tests, which were negative for drugs.  Police also tested residue from the blender Simpson used to make the shakes, which similarly yielded negative results.  Test results from red stains found on C.S.'s sweatshirt also proved fruitless.

¶ 8    Simpson was charged with four counts of attempted first degree murder (two counts per child under alternate theories) and two counts of child abuse.  § 18-3-102(1)(a), (1)(f), C.R.S. 2025 (first degree murder); § 18-2-101(1), C.R.S. 2025 (attempt); § 18-6-401(1)(a), (7)(b)(I), C.R.S. 2025 (child abuse).  The jury convicted him as charged.

## II.    Sufficiency

¶ 9    Simpson first argues that the prosecution introduced insufficient evidence to support his convictions for attempted first degree murder.  We disagree.

### A.    Standard of Review and Applicable Law

¶ 10    We review the record de novo to determine whether the evidence "was sufficient in both quantity and quality to sustain a defendant's conviction."  *McCoy v. People*, 2019 CO 44, ¶ 63.  It is the prosecution's burden to establish a prima facie case of guilt.  *Id.*

"We consider 'whether the relevant evidence, both direct and circumstantial, when viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt.'" *Id.* (citation omitted).

¶ 11　"A verdict cannot rest on guessing, speculation, conjecture, or a mere modicum of relevant evidence." *McBride v. People*, 2022 CO 30, ¶ 38.　But sufficient and substantial evidence "can be either direct *or* circumstantial." *People v. Daniels*, 240 P.3d 409, 410 (Colo. App. 2009) (emphasis added).

¶ 12　A person commits first degree murder if, "[a]fter deliberation and with the intent to cause the death of a person other than himself, he causes the death of that person." § 18-3-102(1)(a).　A person also commits first degree murder by "knowingly caus[ing] the death of a child who has not yet attained twelve years of age and the person committing the offense is one in a position of trust with respect to the victim." § 18-3-102(1)(f).　For attempted first degree murder, one must "act[] with the kind of culpability otherwise required for the commission of first degree murder" and "engage[] in conduct constituting a substantial step toward the

commission of the offense." *People v. Harmon*, 2025 COA 38M, ¶ 23 (*cert. granted in part* Mar. 30, 2026). "A substantial step is any conduct, whether act, omission, or possession, that is strongly corroborative of the firmness of the actor's purpose to complete the commission of the offense." *Id.*

## B. Analysis

¶ 13     Consistent with his position at trial, Simpson emphasizes that there was insufficient evidence that he took a substantial step toward first degree murder because there was no forensic evidence, and his conviction rested largely on his alleged confession to B.M. He also contends that the evidence was insufficient to prove that he acted with the requisite intent to cause the children's deaths.

¶ 14     Katherine Brown, a forensic scientist for the Colorado Bureau of Investigation, testified about the forensic evidence. As to the blender, she explained that "there wasn't any visible residue," but she tested a "pink, red tinge that kind of stained the blender." Although the motel owner had not washed the blender after Simpson returned it, she had been using it to water plants. Brown explained that this could have "affected [the] chances of finding any controlled substances in the blender." And she explained that it

5

can be difficult to accurately detect substances that have been diluted in or mixed with other substances. Brown also testified that she "would have been very shocked" if the sweatshirt stain yielded a positive result for controlled substances given the stain's size and saturation. Thus, Brown's testimony provided a plausible explanation for why — even if there was pain medication in the shakes — it would not be readily detectible.

¶ 15 And despite the lack of forensic evidence, there was other evidence of Simpson's guilt. For one, B.M. testified to Simpson's confession. Although B.M. initially told police that Simpson said he was *going to* dissolve pain medicine in the shakes, B.M. testified that Simpson corrected himself. *See People v. Poe*, 2012 COA 166, ¶ 14 (it is the jury's role, not ours, to weigh the credibility of witnesses).

¶ 16 Moreover, contrary to Simpson's contention, his confession to B.M. was not the only evidence of guilt. For example, there was circumstantial evidence that Simpson did not plan to return from Colorado. B.M. and A.D. testified that Simpson said he quit his job before the trip, citing an unspecified terminal illness, and that he spent most of his money on the trip. They also testified to

6

Simpson's extremely distraught emotional state during and after the trip. Additionally, Simpson booked one-way tickets to Colorado without a clear return plan; although he told A.D. he had rented a car to drive home, A.D.'s testimony suggested that Simpson initially made a rental car reservation that did not include a Philadelphia drop off.

¶ 17 The prosecution's "one way trip" theory was further corroborated by a letter from Simpson to A.D.'s sister, C.F., sent on June 12, 2019, while Simpson was in Colorado. Simpson wrote, "I will not have your sister keep my twins away from me. . . . Your sister has broken me and destroyed our family. [C.S] and [D.S.] are staying with me forever." The letter then said that Simpson had sold everything, that he was financially destitute, and that it was "going to be a one-way trip for the three of us. . . . You have no idea how much I'm suffering."

¶ 18 Next, as discussed below, Simpson's confession about putting pain medicine in the shakes was corroborated by evidence that he used pain medication and had twice attempted suicide (once by overdosing on pills). *See People v. Steiner*, 640 P.2d 250, 252 (Colo. App. 1981) (absent chemical testing, circumstantial evidence is

sufficient to prove that a substance is a particular drug). We reject his contention that the prosecution had to establish the amount of pain medication in the shakes or what amount could be lethal. *See People v. Krovarz*, 697 P.2d 378, 381 (Colo. 1985) (Liability for criminal attempt "rests primarily upon the actor's purpose to cause harmful consequences," not whether he "engaged in the harmful conduct or . . . achieved the harmful result."); *United States v. Williams*, 718 F. App'x 890, 893 n.2 (11th Cir. 2017) ("The important factor in proving attempt is the defendant's intent . . . , not whether the underlying crime was actually possible."). And Simpson provides no explanation for why he would drug his children for a reason other than to kill them.

¶ 19 The day he left for Colorado, Simpson also sent letters or "packets" to families at his children's school. The letters disparaged A.D. and publicized intimate information about their relationship. That day, he also mailed a box of "adult paraphernalia" to C.F. Like the evidence that Simpson spent all his money on the trip and quit his job, this was circumstantial evidence of intent; it suggested that he had no concern for his and the children's financial or reputational well-being because he did not intend for them to

8

survive. *See People v. Miralda*, 981 P.2d 676, 679 (Colo. App. 1999) ("Intent may . . . be established from circumstantial evidence and from the inferences that may reasonably be drawn from those circumstances.").

¶ 20 Finally, there was evidence of motive. One reason for Simpson and A.D.'s separation was because A.D. met someone else, and the evidence established that A.D.'s new relationship created significant tension between Simpson and A.D. In Simpson's letter to C.F., he said he would not allow the children to be around A.D.'s new partner, nor would he allow A.D. to keep the children away from him. This was circumstantial evidence of Simpson's intent to keep the children from A.D. and her new partner by killing them.

¶ 21 In sum, there was evidence that Simpson was depressed, suicidal, and angry at his ex-wife and her new partner; sold his belongings; quit his job; spent all his money on the trip; and "burned bridges" with people in his life. There was also evidence that Simpson had access to pain medication, previously attempted suicide by overdosing, and admitted to adding pain medication to the children's shakes. Overall, viewed in a light most favorable to the prosecution, there was sufficient evidence for a jury to conclude

that Simpson, with the requisite intent, took a substantial step toward the commission of first degree murder by giving his children milkshakes laced with pain medication. *See McCoy*, ¶ 63.

## III. Jury Instruction Challenges

¶ 22 Simpson next argues that the court erred by denying his request for an abandonment instruction and that the court gave legally inaccurate instructions on criminal attempt. We disagree with Simpson's first contention and conclude that his second contention does not rise to the level of plain error.

### A. Standard of Review

¶ 23 "We review de novo whether jury instructions adequately inform the jury of the governing law." *Garcia v. People*, 2023 CO 30, ¶ 9. We consider the instructions' legal accuracy as well as whether they are confusing or misleading. *Id.*

¶ 24 When a defendant does not object to jury instructions, we review for plain error. *Hoggard v. People*, 2020 CO 54, ¶ 13. "[T]he court's failure to instruct the jury properly does not constitute plain error if the relevant instruction, read in conjunction with other instructions, adequately informs the jury of the law." *People v. Miller*, 113 P.3d 743, 750 (Colo. 2005).

¶ 25    Similarly, when a defendant fails to request a jury instruction, we review for plain error. *People v. Jacobson*, 2017 COA 92, ¶ 8. An error is plain if it is obvious and substantial and "so undermine[s] the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction." *Hagos v. People*, 2012 CO 63, ¶ 14 (citation omitted).

### B.    The Abandonment Instruction

¶ 26    Simpson contends that the district court plainly erred by failing to sua sponte instruct the jury on the affirmative defense of abandonment. As Simpson acknowledges, he did not request an abandonment instruction, so we review for plain error. *Jacobson*, ¶ 8. We conclude that the district court did not err.

¶ 27    To receive an abandonment instruction, the defendant must present "some credible evidence," *O'Shaughnessy v. People*, 2012 CO 9, ¶ 6, that he "abandon[ed] his effort to commit the crime or otherwise prevent[ed] its commission . . . under circumstances manifesting the complete and voluntary renunciation of his criminal intent." *Id.* at ¶ 8 (quoting § 18-2-101(3)).

¶ 28    However, "mere withdrawal — particularly when faced with resistance by the victim — before completing the murder . . . is

11

insufficient evidence of abandonment." *Id.* at ¶ 20.  Similarly, the defense is unavailable if the attempt "fails because of unanticipated difficulties in carrying out the criminal plan at the precise time and place intended." *People v. Gandiaga*, 70 P.3d 523, 528 (Colo. App. 2002) (quoting 2 Wayne R. LaFave & Austin W. Scott, *Substantive Criminal Law* § 6.3, at 53 (1986)); *see also* § 18-2-401(1)(a), C.R.S. 2025 (prohibiting the abandonment defense if it is "motivated in whole or in part by" circumstances that "make[] more difficult the consummation of the crime").  Here, there was evidence that Simpson abandoned his attempt only after the children refused to drink the shakes and after he tried to improve the taste.

¶ 29    Moreover, Simpson's decision not to assert an abandonment defense appears to have been tactical.  *See People v. Wade*, 2024 COA 13, ¶ 16 ("When the defense makes a tactical decision not to submit an . . . instruction, a trial court's failure to sua sponte offer the instruction does not constitute error, much less plain error.").  Simpson submitted a "general denial" theory of defense, and defense counsel's trial strategy emphasized the lack of forensic evidence.  Simpson does not cite — nor could we identify — any record evidence regarding a possible abandonment defense.  *Cf.*

*People v. Stewart*, 55 P.3d 107, 119 (Colo. 2002) (omitting an intervening cause instruction for two charges appeared to be inadvertent where the defendant relied heavily on the theory at trial and requested the same instruction for other charges).

¶ 30    Generally, a court does not commit obvious (i.e., plain) error by failing to give an unrequested affirmative defense instruction. *See, e.g., People v. Lee*, 30 P.3d 686, 689 (Colo. App. 2000); *People v. Gorman*, 983 P.2d 92, 95 (Colo. App. 1998), *aff'd on other grounds*, 19 P.3d 662 (Colo. 2000).  Therefore, we conclude that the court did not plainly err by failing to sua sponte instruct the jury on abandonment.  *See Scott v. People*, 2017 CO 16, ¶ 17 (holding that errors are generally not obvious if "a division of the court of appeals has previously rejected an argument being advanced by a subsequent party who is asserting plain error"), *abrogated on other grounds by*, *Whiteaker v. People*, 2024 CO 25, ¶ 25.

## C. The Attempt Instructions

¶ 31 Simpson next challenges the jury instructions given for attempt crimes.[1]

¶ 32 The challenged instructions appear to split the attempt element into two separate elements. For example, the court gave the following instruction for attempted first degree murder after deliberation:

> 1. That the defendant,
>
> 2. in the State of Colorado, at or about the date and place charged,
>
> 3. after deliberation,
>
> 4. and with the intent to cause the death of a person other than himself,
>
> 5. engaged in conduct constituting a substantial step toward the commission of Murder in the First Degree — After Deliberation, and
>
> 6. *attempted to cause the death of another person.*

---

[1] The jury was instructed on two theories of attempted first degree murder (after deliberation and child under twelve by one in a position of trust) and two lesser included offenses (one for each theory of attempted murder).

14

(Emphasis added.) The other attempt instructions similarly included one element requiring "conduct constituting a substantial step toward the commission" of the offense and one element requiring an "attempt[] to cause the death" of a person.

¶ 33    Simpson did not object to the instructions but contends on appeal that the district court erred by including the additional language (the emphasized element above). The State agrees that the extra element was improper but argues that the error was not plain. We agree with the State.

¶ 34    A division of this court has considered a similar attempted murder instruction: "1. [T]he defendant . . . 4. attempted to, 5. engage in conduct constituting a substantial step toward the commission of" first degree murder. *People v. Villarreal*, 131 P.3d 1119, 1124 (Colo. App. 2005). In finding no plain error, the division explained that the instruction properly defined attempt as "a substantial step toward the commission of the offense," so "a reasonable jury would have recognized the inherent redundancy" in the two attempt elements. *Id.* at 1125.

¶ 35    Here, save for the added attempt language, the instructions aligned with the model jury instructions and applicable statutes.

15

*See* COLJI-Crim. G2:01, 3-1:01, 3-1:06, 3-1:07 (2025); § 18-2-101; § 18-3-102(1)(a), (f); § 18-3-103, C.R.S. 2025; § 18-6-401(1)(a).  The instructions also correctly defined a substantial step as "any conduct, whether act, omission, or possession, which is strongly corroborative of the firmness of the actor's purpose to complete the commission of the offense."  § 18-2-101(1).

¶ 36     Unlike in *Villareal,* the instructions here did not explicitly define attempt as a substantial step, but we do not think this makes them distinguishable.  Notwithstanding the extra element, the instructions here were otherwise legally accurate.  *See Miller*, 113 P.3d at 750.  Moreover, if the jury found that Simpson took a substantial step toward committing murder, it necessarily found that he attempted murder.  Therefore, the erroneous added element did not cast doubt on his conviction.  *See State v. Williams*, 2015 WI 75, ¶ 62 ("[W]hen an erroneous jury instruction raises the State's burden by adding an element not necessary for conviction, and the jury convicts, the jury verdict will often sufficiently show that the jury would have convicted if instructed on the proper elements.").

¶ 37     We also reject Simpson's argument that the instructions were so misleading as to constitute plain error.  Any confusion was likely

in Simpson's favor because the jury would have believed that the prosecution had to prove more than was required. *See Hoggard*, ¶¶ 30, 33 (finding no reversible error when an instruction "simply placed an additional burden on the prosecution to prove more" than was legally required). Accordingly, Simpson has not shown that the error undermined the reliability of his conviction. *See Hagos*, ¶ 14.

## IV. Evidentiary Challenges

¶ 38 Simpson next raises several evidentiary challenges, arguing that the district court reversibly erred by admitted hearsay evidence, evidence of his prior bad acts, and pretrial screening evidence. We reject each of these arguments in turn.

### A. Standard of Review

¶ 39 We review evidentiary rulings for an abuse of discretion. *People v. Schlehuber*, 2025 COA 50, ¶ 42. A district court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair or when it is based on an incorrect understanding of the law. *Id.* We review preserved evidentiary challenges for harmless error and reverse if "there is a 'reasonable probability' that the error contributed to the defendant's conviction." *Id.* at ¶ 45 (quoting *People v. Vanderpauye*, 2023 CO 42, ¶ 66). We review unpreserved

evidentiary challenges for plain error and reverse only if the error was obvious and substantial and "so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction." *Hagos*, ¶ 14 (citation omitted).

## B. Hearsay Evidence

¶ 40 We first consider Simpson's argument that the district court erred by admitting A.D.'s testimony about Simpson's prescriptions. The prosecutor asked if A.D. knew what medications Simpson took. Defense counsel objected for lack of foundation, and the prosecutor then asked whether A.D. and Simpson were on the same insurance plan. A.D. said that Simpson was on her insurance plan in June 2019 and that the insurance company sent her monthly statements listing his prescriptions. Defense counsel raised a hearsay objection, which the district court overruled, finding that A.D. could testify to her observations. A.D. then testified that Simpson received tramadol for pain and testosterone. She also said she believed he was prescribed oxycodone at some point.

¶ 41 We agree with Simpson that the district court abused its discretion by admitting inadmissible hearsay but conclude that the error was harmless. *See Schlehuber*, ¶ 45.

¶ 42    Hearsay is "a statement other than one made by the declarant while testifying . . . , offered in evidence to prove the truth of the matter asserted." CRE 801(c). A "statement" includes "an oral or written assertion." CRE 801(a). Hearsay is inadmissible except as provided by the Colorado Rules of Evidence or other statutes or rules. CRE 802. Under CRE 701, a lay witness may give testimony in the form of opinions or inferences that are rationally based on the witness's perceptions. But Rule 701 is not an exception or exemption to the rule against hearsay.[2] *See Taxinet Corp. v. Leon,* 114 F.4th 1212, 1225 (11th Cir. 2024) ("[A] lay witness may base opinion testimony on what [he] heard, [but] this does not mean that lay opinion[s] may be based on hearsay." (second alteration in original) (citation omitted)); *Stephans v. State,* 262 P.3d 727, 731 (Nev. 2011) ("[A] lay witness cannot give opinion testimony based on otherwise inadmissible hearsay.").

¶ 43    The insurance records contained an out-of-court written assertion that Simpson received certain prescriptions, and A.D.'s

---

[2] Because CRE 701 parallels its federal counterpart and the rules of evidence of many states, we may consider cases from other jurisdictions. *See People v. Faussett,* 2016 COA 94M, ¶ 40 n.6.

testimony offered that assertion for its truth.  *See* CRE 801(a), (c); *see also Burchfield v. State*, 892 So.2d 191, 198 (Miss. 2004) (holding that a pill bottle's medication label is hearsay when used to prove its contents).  Therefore, absent a recognized exception or exemption, the testimony was inadmissible.  *See* CRE 802.

¶ 44    The State argues that the insurance records were machine generated, so they do not constitute human statements that fall within the ambit of the hearsay rules.  We disagree.  Testimony regarding a computer-generated record is not hearsay if it was created "*without human input or interpretation.*"  *People v. N.T.B.*, 2019 COA 150, ¶ 22 (emphasis added); *cf. People v. Hamilton*, 2019 COA 101, ¶¶ 24-26 (holding that reports were hearsay because there was no evidence that they were created without human input or interpretation).  No evidence explained how the insurance documents were created, so we cannot conclude that they were solely machine generated.[3]  *See Hamilton*, ¶¶ 24-26.

---

[3] The business records exception under CRE 803(6) also did not apply because there was insufficient foundation to support admission on that basis.  *See Curry v. Brewer*, 2025 COA 28, ¶ 50.

¶ 45    However, given the ample other evidence that Simpson had access to pain medication, A.D.'s inadmissible testimony was harmless. *See People v. Caldwell*, 43 P.3d 663, 668 (Colo. App. 2001) ("[I]f the evidence is merely cumulative and does not substantially influence the verdict or affect the fairness of the trial proceedings, any error in its admission is harmless.").

¶ 46    First, B.M. testified that Simpson confessed to putting pain medication in the children's shakes. Second, B.M., C.F., and A.D. testified about Simpson's previous suicide attempt via overdose. Therefore, it was essentially undisputed that Simpson had access to (or knew how to access) medication that could cause death or overdose. We cannot say A.D.'s inadmissible testimony about Simpson's prescriptions for such medications "substantially influence[d] the verdict or affect[ed] the fairness of the trial proceedings." *Id.*

## C.    Evidence of Prior Bad Acts

¶ 47    Simpson next argues that the district court improperly admitted evidence of his extrinsic bad acts without determining admissibility under CRE 404(b). He also argues that the evidence

21

was inadmissible under CRE 403.  He did not object to the challenged evidence, so we review for plain error.[4]  *Hagos*, ¶ 14.

¶ 48      Rule 404(b) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character" but may be admissible for purposes such as "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  *See Rojas v. People*, 2022 CO 8, ¶ 26.  The rules of evidence allow courts to "admit uncharged misconduct evidence for almost any non-propensity purpose."  *Id.* at ¶ 28.

¶ 49      To be admissible, "[s]uch evidence must be (1) logically relevant (2) to a material fact (3) independent of the prohibited inference of the defendant's bad character, and (4) the probative value of the evidence must not be substantially outweighed by the risk of unfair prejudice."  *Id.* at ¶ 27.  To determine whether

---

[4] We reject Simpson's contention that the "issue is preserved by operation of CRE 404(b)(3)," which outlines the prosecution's notice requirements.  We are unaware of any authority altering a defendant's duty to preserve arguments for appeal based on the prosecution's duty to disclose certain evidence before trial.

evidence was unduly prejudicial under Rule 403, "we assume the maximum probative value that a reasonable fact finder might give the evidence and the minimum unfair prejudice to be reasonably expected." *People v. Clark*, 2015 COA 44, ¶ 18 (citation omitted).

¶ 50 Simpson first argues that testimony about his prior suicide attempts was improper character evidence. But "evidence of a person's suicidal disposition is not character evidence." *State v. Buelow*, 951 N.W.2d 879, 889 (Iowa 2020); *see also State v. Stanley*, 2001-NMSC-037, ¶ 22 ("Suicidal dispositions typically stem from mental illness, not from a person's 'bad character' or trait of character."). Thus, Rule 404(b) does not apply to Simpson's suicide attempts. *See Rojas*, ¶ 43.

¶ 51 We also reject Simpson's argument that the evidence's "probative value [was] substantially outweighed by the danger of unfair prejudice." CRE 403. "Evidence is only unfairly prejudicial if it has an undue tendency to suggest a decision on an improper basis such as sympathy, hatred, contempt, retribution, or horror." *People v. Raehal*, 2017 COA 18, ¶ 16. The suicide attempts helped explain Simpson's mental health challenges and provided a plausible explanation for the inner turmoil that led him to consider

killing his children. The overdose also established method and opportunity. *See Rojas*, ¶ 28. Moreover, because the suicide attempts were not described at length or in detail, it is unlikely that they could have engendered strong negative emotions in the jury. *See Raehal*, ¶ 16.

¶ 52     Next, Simpson challenges A.D.'s testimony that, on the day of Simpson's second suicide attempt, he wrote notes in lipstick on mirrors in the family home and put family photos on the dining table. A.D. described his behavior as "creepy" and "eerie." Even if this is character evidence, there is no indication that it was offered for a propensity purpose. Rather, as with the suicide attempts, it contextualized Simpson's devolving mental health. And for similar reasons, it was not unduly prejudicial under Rule 403.

¶ 53     Simpson also challenges C.F.'s testimony about the box Simpson mailed to her the day he left for Colorado. C.F. testified that the box contained "adult paraphernalia" without elaborating on its contents. Again, even assuming this is character evidence, it does not appear to have been offered to prove that Simpson acted in accordance with any character trait. *See Rojas*, ¶ 27. Rather, it was probative of his mental state before the trip, and it supported

the prosecution's theory that Simpson was planning to kill himself and his children and had nothing to lose by burning bridges with people in his life. Nor was the evidence inadmissible under Rule 403. C.F. briefly mentioned the box and did not specifically describe its contents, so the prejudicial risk was minimal.

¶ 54 Next, Simpson challenges evidence about the letters or "packets" he sent to families whose children attended school with C.S. and D.S. A.D. testified that she spoke to a detective about the letters. She explained that the letters disparaged A.D. and discussed her "being awful," her new romantic partner, and A.D. and Simpson's open relationship before they separated. A detective testified that he responded to a report regarding the letters, which he described as "harassing in nature."

¶ 55 As with the other challenged evidence, the letters had a relevant, nonpropensity purpose; they offered context for Simpson's mental state before the trip and supported the prosecution's theory that he believed he had nothing to lose by harming his family's

reputation.[5] *Rojas*, ¶¶ 27, 28.  Finally, the letters' probative value was not "substantially outweighed by the risk of unfair prejudice." *Id.* at ¶ 27; CRE 403.  They were not admitted into evidence, and the trial testimony only discussed their general content.

¶ 56 The final piece of evidence that Simpson challenges under Rule 404(b) is a forensic interview of C.S., in which the interviewer asked questions to determine whether C.S. had been sexually abused.  It is unclear if all or part of the video of the interview was played for the jury.[6]  But C.S. said she had not experienced inappropriate sexual contact, and the interviewer's questions did not suggest concerns about Simpson.  Therefore, the evidence did not implicate Simpson's character and was not unfairly prejudicial because the questions did not discuss him.  *See Rojas*, ¶¶ 27-28.

¶ 57 In sum, we conclude that the challenged evidence was admissible under Rules 404(b) and 403.  Finally, because Simpson did not timely object to the challenged evidence, the district court

---

[5] Although Simpson's brief contends that he was convicted of harassment based on the letters, evidence of the conviction and charges was not presented to the jury in this case.
[6] The record does not reflect a request to redact parts of C.S.'s interview.

did not plainly err by failing to analyze it under *People v. Spoto*, 795 P.2d 1314 (Colo. 1990). *See Rojas*, ¶ 52 (requiring a *Spoto* analysis "if extrinsic evidence suggests bad character"); *People v. Thompson*, 950 P.2d 608, 614 (Colo. App. 1997) (holding that district court's failure to sua sponte conduct a *Spoto* analysis of unchallenged evidence was not plain error).

### D. Pretrial Screening Evidence

¶ 58 Simpson's last evidentiary contention concerns testimony about the process involved in prosecuting his case.

¶ 59 During cross-examination of Detective John Monaghan, defense counsel elicited testimony that Monaghan met with the office of the district attorney (DA) in February 2020. Monaghan then confirmed that no charges were filed in February, and he did not draft an arrest warrant until May 2020. On redirect, the prosecutor asked about the meeting with the DA's office, and Monaghan answered the following question affirmatively: "[A]fter that meeting, did you provide all of the materials from the case for the [DA's] office to review to make a decision about whether or not to file the case?" He elaborated,

> We had the meeting, which is depending on the case and the circumstances, part of the . . . process at times in our unit. And . . . part of that process is if we were to have those meetings we then formally file the entirety of the case, documentation and everything that we have, over to the DA's office to review and then make a recommendation from there. In the event that during that discussion the details are not covered as thoroughly as maybe they would be seen in reading the case.

Finally, Monaghan agreed that the case was filed "after [a] thorough review by the Special Victim's Unit at the [DA's] office."

¶ 60    Generally, information about charging decisions is inadmissible because it "may imply that, because of a pretrial screening process, only guilty parties are charged with crimes and thus the defendant must be guilty." *People v. Mendenhall*, 2015 COA 107M, ¶ 62. This evidence may suggest "that additional evidence supporting guilt exists that is unknown to the jury," or it may reveal a witness's personal opinions as to the defendant's guilt. *Id.* However, a prosecutor can elicit information about charging decisions when defense counsel opens the door to such evidence. *See id.* at ¶¶ 64, 67; *People v. Davis*, 312 P.3d 193, 196-97 (Colo. App. 2010), *aff'd*, 2013 CO 57. For example, in *Mendenhall*, ¶¶ 55-56, 64, 67, a division of this court held that the defense opened the

door to questions about a DA investigator's process when defense counsel's opening statement emphasized that charges were not brought until 2010 for conduct reported in 2008.

¶ 61 We agree with the State that Simpson opened the door to the challenged line of inquiry by suggesting that the case against him was weak because it took several months to make a charging decision. The challenged part of the redirect examination was clearly a response to the testimony defense counsel had elicited; the redirect testimony helped explain why a thorough factual investigation takes time and can delay charging decisions.

¶ 62 Additionally, Monaghan's testimony did not suggest that any unadmitted evidence supported Simpson's guilt, nor did it express an opinion regarding Simpson's guilt. *See id.* at ¶ 62; *see also People v. Garcia*, 2023 COA 58, ¶¶ 52, 58-59 (no plain error when a prosecutor said charges cannot be brought absent "a good faith belief that we can prove the charge" because the statement did not suggest that unadmitted evidence supported the defendant's guilt). Under these circumstances, there was no error, much less plain error; defense counsel opened the door to the prosecutor's

questions, and the testimony did not pose a risk of suggesting guilt based on unadmitted evidence or Monaghan's personal opinion.

## V.    Cumulative Error

¶ 63    Finally, we reject Simpson's argument that cumulative error requires reversal.  Cumulative error does not require reversal "unless the cumulative effect of the errors shows that a defendant's right to a fair trial was substantially prejudiced." *Mendenhall*, ¶ 82.

¶ 64    We have agreed with Simpson on two contentions of error but held that one error was not plain and the other was harmless. Specifically, as to the erroneous attempt instructions, we concluded that the error likely raised the prosecution's burden of proof, rendering it not plain.  And we held that the inadmissible hearsay evidence was cumulative of other unchallenged evidence, rendering the error harmless.  Under these circumstances, we discern no cumulative error that substantially prejudiced Simpson's right to a fair trial.

## VI.    Disposition

¶ 65    The judgment of conviction is affirmed.

JUDGE KUHN and JUDGE SULLIVAN concur.