The PEOPLE of the State of Colorado,
Plaintiff–Appellee,

v.

Cameron Chad DAVIS, Defendant–
Appellant.

No. 07CA1320.

Colorado Court of Appeals,
Div. V.

May 27, 2010.

John W. Suthers, Attorney General, Jennifer A. Berman, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Neff Services, Inc., Lauretta A. Martin Neff, Bayfield, Colorado, for Defendant–Appellant.

Opinion by Judge GRAHAM.

The defendant, Cameron Chad Davis, was convicted of reckless manslaughter as a lesser-included offense of a first-degree murder charge, accessory to a crime, and reckless endangerment for his participation as a driver in a drive-by shooting. He appeals his convictions, arguing that the trial court erred in admitting statements by witnesses con-

cerning other witness' veracity and arguing that the prosecutor unfairly remarked about defendant's Fifth Amendment right to silence. We affirm.

## I. Background

It was undisputed at trial that defendant was the driver in a drive-by shooting; that defendant's girlfriend, E.W., was the owner of the car; and that his friend, "Smoke," was the shooter. As the prosecutor stated during his final closing argument, "the issue that remain[ed] for [the jury's] consideration [was], did the defendant know what was going to happen?"

The prosecutor argued that there were "three areas of evidence that clearly show[ed] the defendant's knowledge of what was going to happen" on the morning of the shooting: (1) the fact that defendant made a U-turn while driving E.W.'s car, thus driving back toward the victim; (2) the testimony of W.C. that defendant called him earlier that evening and asked him if he wanted to "ride on some fools," which according to the testimony, meant defendant was asking W.C. if he wanted to shoot some gang members; and (3) the testimony of E.W. that she overheard defendant having a conversation with Smoke about "getting some Oops," which according to the testimony, meant getting into an altercation with members of the gang known as the "Bloods."

Thus, the testimony of W.C. and E.W. was important to the prosecution's case in proving defendant's deliberation and knowing participation in the shooting.

## II. Evidentiary Issues

Defendant argues that a number of the trial court's evidentiary rulings were in error. We review a trial court's evidentiary rulings for an abuse of discretion. *People v. Stewart*, 55 P.3d 107, 122 (Colo.2002). A trial court abuses its discretion when its ruling is "manifestly arbitrary, unreasonable, or unfair." *People v. Ibarra*, 849 P.2d 33, 38 (Colo.1993). Because defendant preserved each issue for review with a contemporaneous objection, we review for harmless error and consider whether the error, in light of the entire record of the trial, substantially

influenced the verdict or impaired the trial's fairness. *Stewart*, 55 P.3d at 124.

### A. Comments on Witness Veracity

Defendant first argues that the court erred in admitting statements by witnesses commenting on other witnesses' veracity. We conclude that because the veracity comments were elicited to explain police officers' investigative techniques and to rebut the defense's arguments, the trial court did not err.

Defendant challenges four instances in which the trial court admitted testimony that commented on witnesses' truthfulness: (1) a detective testified that she became confrontational in an interview with a witness, E.W., because she did not believe E.W.; (2) the detective testified that she followed certain leads because she did not necessarily believe what defendant told her on the telephone; (3) she did not obtain W.C.'s phone records because his information had proven credible; and (4) a detective's comments in a videotaped interview suggested that he thought the witness was not telling the truth.

The determination of the credibility of witness is "solely within the province of the jury." *People v. Gonzales*, 666 P.2d 123, 128 (Colo.1983). "Were they lying" questions are categorically improper, because (1) they offer little or no probative value, (2) they ignore numerous alternative explanations for evidentiary discrepancies that do not involve lying, (3) they infringe upon the province of the fact-finder, and (4) they are argumentative. *Liggett v. People*, 135 P.3d 725, 731–32 (Colo.2006). While CRE 608(a)(1) permits a witness to express her opinion regarding another witness' character for truthfulness, it does not allow a witness to testify that another witness is testifying truthfully on a particular occasion. *See People v. Hall*, 107 P.3d 1073, 1078 (Colo.App. 2004).

Additionally, "evidence referencing victim credibility only to describe a device to interrogate a suspect and to explain the context in which a suspect's statements are made is admissible." *Compare People v. Lopez*, 129 P.3d 1061, 1066 (Colo.App.2005),

with *People v. Oliver,* 745 P.2d 222, 225 (Colo.1987) (holding that investigator could not opine that he believed a child victim when the testimony did not relate to investigatory techniques). These statements by investigators are also admissible as part of the give-and-take of an interrogation. *Lopez,* 129 P.3d at 1066 (citing *State v. Palmes,* 964 S.W.2d 241, 243–44 (Mo.Ct.App.1998)).

## B. Opening the Door

■ We first address an issue which we believe to be determinative of several challenges to the testimony and appears to be one of first impression in Colorado: whether defense counsel may open the door to questions concerning the method of interrogation by detectives and the motives of witnesses to change their testimony by raising those issues in an opening statement. Defendant contends that because opening statements are not evidence, statements made therein do not open the door. We agree with the People that defense counsel's opening statements may open the door.

■ "It is widely recognized that a party who raises a subject in an opening statement 'opens the door' to admission of evidence on that same subject by the opposing party." *United States v. Chavez,* 229 F.3d 946, 952 (10th Cir.2000) (allowing admission of hearsay statements referred to in opening by defense). *See United States v. Croft,* 124 F.3d 1109, 1120 (9th Cir.1997) (permitting the bolstering of testimony of a witness who was branded as a "liar" in opening statement). *Cf. People v. Renfro,* 117 P.3d 43, 46 (Colo.App.2004) (allowing testimony by detective to bolster a prior statement when door was opened by cross examination). *But see United States v. Tomaiolo,* 249 F.2d 683, 689 (2d Cir.1957) ("[T]he opening statement of counsel for the defendant could not have put the defendant's character at issue. Such a statement has no evidentiary value, and therefore does not call for or justify cross-examination or rebuttal evidence."); *United States v. Green,* 648 F.2d 587, 595 (9th Cir. 1981) ("A witness may, of course, be cross-examined about matters which he has put in dispute. An opening statement, having no evidentiary value, cannot operate to place an issue in controversy.") (internal citations omitted); *Bynum v. Commonwealth,* 28 Va. App. 451, 506 S.E.2d 30, 34 (1998) ("[S]tatements made during an opening statement are not evidence; therefore, opening statements may not 'open the door' to otherwise inadmissible evidence."); *State v. Richards,* 190 W.Va. 299, 438 S.E.2d 331, 335 (1993) ("[T]he simple mention of character issues during an opening statement does not lay a proper foundation for, or open the door for, the introduction of otherwise inadmissible character evidence on rebuttal."). In light of the nature of an opening statement, advising the jury of evidence that counsel intends to produce, we agree with those authorities that treat opening statements like other stages of trial. *See United States v. Moore,* 98 F.3d 347, 350 (8th Cir.1996) (opening statement opened door to evidence of prior bad acts); *United States v. Knowles,* 66 F.3d 1146, 1161 (11th Cir.1995) (opening statement opened the door to attack credibility of witness). Therefore, we will review the contentions of trial error regarding witness veracity against this standard.

## C. Witness E.W.

■ E.W.'s initial statement to the police was generally supportive of defendant's testimony at trial. But after a fairly lengthy interrogation by the police, she made additional statements that were damaging to defendant. She told the detectives that defendant was aware her brother had been shot at by gang members, and shortly before the shooting she had overheard defendant and Smoke talking about "going to get some Oops." This testimony provided the prosecution with a motive for the shooting (retaliation for the earlier shooting at E.W.'s brother) and contradicted defendant's claim that he was an innocent bystander and not an active participant in the shooting.

However, we conclude defendant opened the door to this testimony in his opening statement when defendant's counsel quoted an interview between a detective and E.W., a key prosecution witness. During the interview, the detective had become confrontational. Defense counsel quoted E.W.'s interview heavily during his opening statement,

and stressed that E.W. was only helpful to the police after the interview became confrontational: "[s]he has been threatened with prison. She is threatened and told that she will not see her kids. And then we finally get to the story that they want you to hang your hat on." Regarding the detectives' investigative techniques and their failure to obtain certain phone records based on W.C.'s information, defense counsel said "I don't know why those records were never obtained" and "[t]he police did not obtain W.C.'s [phone] records."

On direct examination, the prosecutor asked the detective why the interview had become confrontational: "[c]an you explain to the jury why it happened that way?" After defendant's objection was overruled, the detective explained that she did not believe what E.W. was telling her.

On cross-examination, defense counsel questioned the detective regarding the tone of the E.W. interview. The issue was raised again on redirect and the court overruled defendant's objection but gave the following limiting instruction to the jury:

> It's not improper for a witness to comment on what her own thought process was.... [T]he jury is reminded it will ultimately be their determination of what part of a witness's testimony they may believe and they'll receive certain instructions that they may believe all of the testimony or part of it or none of it.

Here, the prosecution explored areas of inquiry that would have been off-limits if not for the doors left open by defense counsel. While the detective's motives for changing her tactics during the interview are irrelevant in the abstract, they were relevant here to inform the jury's understanding of the tenor of the confrontation between the detective and E.W. (The detective's statements could have been said in different ways, depending on whether they were born of honest skepticism or calculated hostility.) This inquiry was in turn relevant to inform the jury's evaluation of E.W.'s interview. It helped the jury decide whether E.W. changed her story because she had been bullied (as defense counsel had suggested in his opening statement) or because she had

finally decided to tell the truth to the detective (as the prosecution contended). Thus, the prosecution was permitted to place such an allegation in context in order to show why E.W. changed her story.

## D. Witness W.C.

 In his opening statement, defense counsel also questioned the investigation of W.C., suggesting that although there were numerous phone records produced in the case, none of them supported W.C.'s purported statement that defendant had called him requesting that he join a "ride on some fools." On direct examination, the detective testified that W.C. "had details that were true as to what we had already investigated and found out. So I was comfortable with what he had told me." Later on in her examination, the detective explained that she did or did not follow up on certain leads because of her personal assessment of the truthfulness of defendant and the interview statements of another prosecution witness, W.C.

Although bolstering testimony is normally inadmissible, it is permitted where the defense opens the door by suggesting that a witness' statement cannot be substantiated. *Cf. Renfro*, 117 P.3d at 46. In light of our conclusion that defense counsel opened the door in her opening statement, we conclude that the bolstering of W.C. was not error.

## E. Defendant's Mother

Defendant also objected to the admission of a videotaped interview between a detective and defendant's mother, in which the detective said, "This time we're going to deal with the truth, fair enough?" The detective explained his confrontational statement, testifying that "I think I needed to take a little different approach with her, because she obviously hadn't been entirely truthful with us previously."

We conclude that this testimony was admissible under *Lopez*, 129 P.3d at 1066, because it explained the basis for the interrogation.

### III. CRE 608(a) Evidence

██ Defendant argues that the trial court erred in failing to admit CRE 608(a) opinion evidence regarding a witness' truthfulness. We agree, but conclude that the error was harmless.

During the trial, Q.W., E.W.'s brother, was asked if, "in your opinion, your sister is someone who doesn't lie?" The prosecution's objection to the question was sustained even though the question, if given a proper foundation, was proper under the plain text of CRE 608(a): "[t]he credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation." *See Honey v. People,* 713 P.2d 1300, 1302–03 (Colo. 1986) (holding that an opinion of a witness' reputation for truthfulness is admissible with the proper foundation).

While a trial court has discretion to determine the "scope and the limits of cross-examination," *People v. Montes–Rodriguez,* 219 P.3d 340, 344 (Colo.App.2009) (*cert. granted in part* July 20, 2009), the court did not exercise that discretion in its ruling here. Rather, the ruling was based upon a misunderstanding of CRE 608(a). Defense counsel argued that his "reading of the rule, Your Honor, is that he can testify as to his own opinion or what the opinion is within the community [where] they reside." The court responded, "I am reading it differently," and sustained the prosecution's objection.

We agree with the defense's reading of CRE 608(a). *See Honey,* 713 P.2d at 1302–03. However, the exclusion of proper opinion testimony is harmless where the defense can fully cross-examine the witness whose credibility was to be impeached, and where that witness's credibility was otherwise impeached through the testifying witness. *Id.* at 1304.

Here, we conclude that the error was harmless because the defense had the opportunity fully to cross-examine E.W., and also had the opportunity otherwise to impeach E.W.'s credibility through this colloquy with Q.W.:

Q. [regarding E.W.] [I]s it fair to say she's not someone that you confide in with your really personal items?

A. Yeah.

Q. Okay. She isn't someone you would tell to go retaliate for you, right?

A. No, sir.

Q. You wouldn't trust her with something like that?

A. No, sir.

*See id.*

### IV. Fifth Amendment Violation

██ Defendant argues that the court erred by allowing the prosecutor to cross-examine him on the issue of his post-arrest silence, to comment on whether the prosecutor believed defendant, and by allowing the prosecutor to refer to the same in closing arguments. We disagree.

██ A trial court's decisions to determine the scope of cross-examination and closing arguments will be upheld absent a showing of an abuse of discretion. *Montes–Rodriguez,* 219 P.3d at 344 (cross-examination); *People v. Perea,* 126 P.3d 241, 247–48 (Colo. App.2005) (closing arguments). A trial court abuses its discretion when its ruling is "manifestly arbitrary, unreasonable, or unfair." *Ibarra,* 849 P.2d at 38.

██ An accused's right to silence derives not from *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), but from the Fifth Amendment itself. *People v. Rogers,* 68 P.3d 486, 492 (Colo.App.2002). In *Doyle v. Ohio,* 426 U.S. 610, 619, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the Supreme Court held that an accused's post-arrest silence after having been given a *Miranda* advisement could not be used for impeachment purposes, because the *Miranda* warnings implicitly assure the defendant that his silence will carry no penalty. *Id.*

██ However, not every reference to a defendant's post-arrest silence warrants reversal. To determine whether a prosecutor's comment on the defendant's silence constitutes reversible error, we should consider "(1) whether the improper remarks were used as a means of creating an inference of guilt; and (2) whether the prosecution argued that the defendant's silence constituted

an implied admission of guilt." *People v. Hall*, 107 P.3d 1073, 1078 (Colo.App.2004).

Even if a defendant's silence was induced by governmental action (e.g., *Miranda* warnings), "the defendant may be impeached by his silence if it rebuts a claim asserted by the defendant at trial." *People v. Chavez*, 190 P.3d 760, 766–67 (Colo.App. 2007) (citing *United States v. Robinson*, 485 U.S. 25, 31–32, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988)); *see Rogers*, 68 P.3d at 492 ("A defendant cannot have it both ways. If he talks, what he says or omits is to be judged on its merits or demerits.") (internal citation omitted). A testifying defendant may also be cross-examined on his partial silence where he makes a statement to law enforcement officials but the statement omits significant details which are later included in a subsequent statement. *People v. Quintana*, 665 P.2d 605, 611 n. 7 (Colo.1983). In these situations, the omission of significant details is in the nature of a prior inconsistent statement. *Id.*

These examinations regarding post-arrest silence are permissible because they do not seek to have jurors infer guilt from silence. *See Hall*, 107 P.3d at 1078. Rather, they seek to respond to statements made either by the defendant or by defense counsel. *Compare United States v. Kaye*, 779 F.2d 1461, 1464–65 (10th Cir.1985) (holding that questioning and comments were in rebuttal, and therefore were not for the purpose of using the defendant's post-arrest silence to impeach trial testimony), *with People v. Taylor*, 159 P.3d 730, 740 (Colo.App.2006) (holding that post-arrest silence was improperly used to impeach trial testimony).

Defendant preserved this issue for review with a contemporaneous objection. When properly preserved, the erroneous admission of evidence concerning a defendant's silence is reviewed for constitutional harmless error. *People v. Welsh*, 58 P.3d 1065, 1072–73 (Colo.App.2002), *aff'd*, 80 P.3d 296 (Colo.2003). We therefore consider whether the guilty verdict "was surely unattributable to the error." *Id.* at 1072. In doing so, we consider the entire record, including jury

instructions and the evidence and arguments presented at trial. *Id.* at 1072–73.

During the course of the criminal investigation and before he was arrested, defendant had two telephone interviews with a detective. Thereafter, he turned himself in to the police and did not speak with law enforcement officials after he received his *Miranda* warnings.

At trial, defense counsel's cross-examination of the detective created some ambiguity about what the detective knew at the time of the investigation:

Defense Counsel: And so you were telling [defendant] things like I don't know for sure what's going to happen, you just need to come in and we need to sort it out, right?

Detective: Right, because at that time I didn't know.

Q. And some of the things you were talking to him about is I don't know everything about the situation, right?

A. Correct.

Q. For instance, you don't know what was going on before the time of the shooting, right?

A. Before the time, during, or after, I didn't know the entire thing.

Q. Right. At that time you said to him you were driving and Smoke was shooting, right?

A. I did say that.

Q. And in a phone call before he said I didn't know it was going to happen like that.

A. Yes.

Q. So you knew that as well.

A. That he said that?

Q. Right.

A. Or that—yes.

Q. And you knew that was part of the situation.

A. Yes.

On redirect examination, the prosecutor addressed the ambiguity by asking the following questions:

Prosecutor: All right. One thing I want to clear up real quickly, you were asked on

cross-examination about this statement about I didn't know it was going to happen like that.

Detective: Correct.

. . . .

Q. Just so it's clear, you knew the defendant when being accused essentially of participating in this crime said he didn't know it was going to happen like that, right?

A. I did.

Q. Does that necessarily mean at the time that you believed him?

A. I don't know at that point when that was initially said that I believed it, no.

Defendant also testified at trial and during his direct examination, he stated that "I had already told [the detective] everything that happened." Later in the direct examination, defendant again mentioned that he had told the detective everything:

A. I didn't tell [G.S.] anything, because I had already told [the detective] everything that happened so I just kind of brushed him off . . .

Q. And you told [the detective], I didn't know it was going to happen like that, right?

A. Yes, ma'am.

Q. And you told [the detective] that you were the driver, right?

A. Yes, ma'am.

Q. And that's what you mean when you say, I told [the detective], right?

A. Yes. And I told her the whole incident that had happened, so I wasn't really paying attention to [G.S.].

On cross-examination, defendant was asked what he told the detective over the phone, and was confronted with his more comprehensive trial testimony. Defense counsel's objection was overruled because the court found that defense counsel had opened the door to this line of inquiry.

Then, the defendant's discussion with the detective was revisited:

Prosecutor: And if I understand you right, you have been waiting 20 months to tell this jury everything that happened, right?

Defendant: Yes, sir;

Q. Same as [the detective], right?

A. No, not the same as [the detective], because we didn't—we were on the phone, the phone is dying, my grandma's crying at me, there's so much more going on than it is right here. I mean, this is my time to talk, you know. When I went to the police station, Renee, I guess, told [the detective] that she couldn't come talk to me without my lawyers being present so our conversation only ended right there . . . .

Q. You wanted to talk?

A. Yes, sir.

Q. But you just didn't?

A. Yes, sir.

Again, defense counsel's objection was overruled.

Defense counsel's closing argument also referred to defendant's silence when counsel urged the jurors to consider: "what has brought Mr. Davis to sit here in this witness chair—at the defendant's table . . . and wait for his turn to get up here and tell you what really happened March 26 of 2005."

In rebuttal argument, the prosecutor responded with the following comments:

Despite what the defendant's assertion is, the first time [the detective], or anyone associated with law enforcement heard the defendant's story was last week. . . . Defense counsel made reference to how, gosh, you know 20 months he's been waiting to go tell his story and he finally has this opportunity. Why did he wait, ladies and gentlemen? Why did he wait?

Defense counsel's objections to both comments were overruled.

We conclude that by testifying that he told the detective "everything," defendant opened the door to what he told the detective and when. The prosecution could not effectively confront defendant's statement without exploring (1) what he told the detective during the phone interviews and (2) whether defendant had an opportunity to speak with law enforcement officials later, but did not tell the whole story. Thus, here, cross-examination regarding defendant's silence, when considered in light of the direct examination, pointed out that his pre-*Miranda* phone in-

terview with the detective was inconsistent with his statement that he told her "everything."

In *United States v. Robinson,* 485 U.S. 25, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988), defense counsel suggested that the defendant did not have a chance to explain things to law enforcement. *Id.* at 27–28, 108 S.Ct. 864. The Supreme Court held that, in light of the comments made by defense counsel, the prosecutor's comment on the defendant's failure to take the stand did not infringe upon the defendant's Fifth Amendment rights. *Id.* at 30, 108 S.Ct. 864. Similarly, here, we conclude the prosecutor's comment, "[w]hy did he wait" when viewed in context, was a fair rebuttal to inferences raised by defense counsel. Accordingly, we discern no abuse of discretion by the trial court in concluding that the prosecutor's comments did not offend defendant's Fifth Amendment rights.

## V. Collateral Issues

Defendant argues that the alleged errors of the trial court were compounded by the prosecutor's comments vouching for various witnesses. Defendant draws our attention to the following comments in the prosecution's closing arguments: "Can you believe [E.W.]? Yes;" "[W.C.]'s description on that DVD has a ring of truth;" and "[W.C.] is credible."

■ It is improper for a prosecutor to interject his or her personal beliefs as to the veracity of witness testimony, *Domingo–Gomez v. People,* 125 P.3d 1043, 1048–50 (Colo. 2005), but prosecutors may properly argue inferences, anchored in evidence, about the truthfulness of a witness' testimony. *Id.* at 1051. We conclude the prosecutor's argument here did not improperly interject personal opinion, personal knowledge, or inflame the passions of the jury. *See id.* at 1050.

Finally, defendant argues for reversal based upon cumulative error. *See People v. Roy,* 723 P.2d 1345, 1349 (Colo.1986). Because we have determined that the trial court only erred in failing to admit a single CRE

---

608(a) opinion, and because that error was harmless, we discern no cumulative error.

The judgment is affirmed.

Judge RUSSEL and Judge ROTHENBERG * concur.

---

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. I, § 5(3), and

§ 24–51–1105, C.R.S.2009.