23CA1346 Peo v Johnson 06-18-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA1346
Jefferson County District Court No. 21CR3250
Honorable Jason Carrithers, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Sean Phillip Johnson,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE BROWN
Harris and Tow, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced June 18, 2026

Philip J. Weiser, Attorney General, Wendy J. Ritz, First Assistant Attorney General, Jenna S. Baker, Assistant Attorney General Fellow, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Leah Scaduto, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Sean Phillip Johnson, appeals the judgment of conviction entered on a jury verdict finding him guilty of internet luring of a child and attempt to commit sexual assault on a child. We affirm.

## I.    Background

¶ 2    In 2021, Investigator Paul Spokas, an investigator for the Child Sex Offender Internet Investigations Unit of the Jefferson County Sheriff's Office, posed as a thirteen-year-old girl on the Whisper application (the persona).[1]  On Whisper, the persona posted, "What's ur whisper secret[?]" and Johnson responded, "My secret?  I like younger . . . [.]  I also would meet someone to fuck, but haven't yet."  The persona and Johnson exchanged several messages on Whisper.  In those messages, the persona told Johnson multiple times that she was thirteen years old.

¶ 3    The conversation moved from Whisper to text messages.  In one message, Johnson indicated that he "love[d] ageplay [sic]," which he explained as "[p]retending you're [twelve] or something."

---

[1] The Whisper application is a social media application that allows anonymous users to post in a general feed.  Other users can interact with that post on the general feed or contact a user directly.

After the persona insisted she was actually thirteen and told Johnson she was not going to text him anymore if he did not believe her, Johnson responded that he was "down it's cool" and said, "I like to be careful on devices others can read, but I'll whisper in your ear that I love it." Johnson later texted, "I really like you're [thirteen]," and "I would want to kiss you right away." He also told the persona, "I'm just being careful honestly in case someone reads this ever," and he sent sexually explicit texts about what he wanted to do to the persona.

¶ 4 At one point, Johnson and the persona arranged a video chat. Investigator Spokas used a prerecorded video of an adult volunteer posing as the persona, appearing to have technical difficulties, and then hanging up.

¶ 5 The persona and Johnson arranged to meet in person for lunch at a fast food restaurant. The persona sent a screenshot of a map with a middle school marked and texted Johnson that she would sneak out during lunch. On the day of the arranged meeting, Investigator Spokas posed as a restaurant employee and identified Johnson when he ordered food through the drive-through.

Investigator Spokas and two other police officers arrested Johnson at the restaurant.

¶ 6　　Johnson was charged with internet luring of a child and attempt to commit sexual assault on a child. A jury convicted him as charged. The district court sentenced Johnson to ten years to life of sex offender intensive supervised probation.

## II.　Challenge for Cause

¶ 7　　Johnson contends that the district court violated his constitutional right to a fair and impartial jury by denying his challenge for cause to Juror B.P. We perceive no error.

### A.　Applicable Law and Standard of Review

¶ 8　　Criminal defendants have a constitutional right to trial by an impartial jury. U.S. Const. amends. VI, XIV; Colo. Const. art. II, § 16. "A defendant's right to an impartial jury is violated if the trial court fails to remove a juror biased against the defendant." *Morrison v. People*, 19 P.3d 668, 672 (Colo. 2000). To that end, a trial court "shall sustain a challenge for cause" based on "[t]he existence of a state of mind in the juror evincing enmity or bias

toward the defendant or the [S]tate." § 16-10-103(1)(j), C.R.S. 2025; *see* Crim. P. 24(b)(1)(X).[2]

¶ 9 Even so, "[a] prospective juror's expression of concern or indication that [they] possess[] a preconceived belief as to some aspect of the case does not . . . mandate exclusion of that juror for cause." *Marko v. People*, 2018 CO 97, ¶ 21; *see People v. Marciano*, 2014 COA 92M-2, ¶ 8 ("While jurors often express concern or indicate preconceived beliefs during voir dire, such concerns and beliefs do not automatically disqualify them from service."). If, after further examination and rehabilitative efforts, the trial court believes that a juror will follow the law and be impartial, the court is not required to remove the juror for cause. *People v. Clemens*, 2017 CO 89, ¶¶ 15-16.

¶ 10 We review for an abuse of discretion a trial court's ruling on a challenge for cause, *id.* at ¶ 13, considering the entire voir dire of the prospective juror, *People v. Oliver*, 2020 COA 97, ¶ 7. A court

---

[2] We note that section 16-10-103(1)(j), C.R.S. 2025, and Crim. P. 24(b)(1)(X) are not identical, but both the Colorado Supreme Court and divisions of this court have treated them as "functional equivalents." *People v. Oliver*, 2020 COA 97, ¶ 8 n.1. Neither party argues any substantive difference between the statute and rule, so we treat them as equivalent too.

abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or when it misapplies the law. *Id.* Employing this standard "gives deference to the trial court's assessment of the credibility of prospective jurors' responses, recognizes the trial court's unique role and perspective in evaluating the demeanor and body language of prospective jurors, and serves to discourage reviewing courts from second-guessing the trial court based on a cold record." *Id.* (quoting *Clemens*, ¶ 13).

### B. Additional Background

¶ 11 During voir dire, the district court asked each juror to answer a series of questions displayed on a posterboard. In response, B.P. explained, among other things, that he worked "for the director of the police academy at Red Rocks Community College," that he worked "with police officers every day," and that he "believe[d] [he] could be fair with both sides." When the prosecutor asked B.P. what his job entailed, B.P. said that he is not a police officer and that his work at the police academy consists of "preparing different course materials and other . . . administrative or secretarial tasks."

¶ 12 Continuing with voir dire of B.P., the prosecutor explained that jurors must assess the credibility of witnesses. She said,

5

> I want you to kind of imagine there's a line in front of me, and somewhere in the middle, neutral, a police officer or a witness walks in, and I put them in the middle. I don't know this person. I haven't heard from them, they could be a good officer or a bad officer, or a good witness or a bad witness. If an officer walks in and they have a badge and a uniform, maybe they have a firearm, on one end[,] I believe absolutely everything that person says, they're a police officer, they're in uniform, so I trust them. On the other end, I believe nothing that person says . . . .

The prosecutor asked B.P., "Given your experience, [are] you able to assess from that middle ground? Can you assess each officer fairly?" B.P. responded, "I think so. I think . . . any evidence or testimony that they would provide would just be dependent on their individual experience, rather than just wearing a uniform."

¶ 13      Later, defense counsel asked the panel if "anyone here . . . feel[s] that police officers . . . or law enforcement are more credible than other people?" B.P. apparently raised his hand, and the following exchange occurred:

> [B.P.]: On the topic of credibility for police officers, I think they're more prepared to be credible.
>
> [Defense Counsel]: Okay.

6

[B.P.]: They have body-worn cameras that they wear, they have set areas through the city they would be in throughout the day if they're on patrol. Any calls are logged. So they have a lot of their day on paper, per se.

[Defense Counsel]: Sure.

[B.P.]: So that they can be prepared to be credible if they need to be.

[Defense Counsel]: Right. And in the course of your work at the police academy, are officers . . . trained or informed about how to testify in court?

[B.P.]: There are mock trials that happen in the academy, yes.

[Defense Counsel]: Okay. And what kind of training do they get in association with these mock trials?

[B.P.]: How to . . . properly convey . . . what happened. Or how to communicate with the [j]udge or different moving parts in the courtroom.

[Defense Counsel]: Maybe even speak to the jury?

[B.P.]: Sure.

¶ 14    Defense counsel moved to strike B.P. for cause because he worked for the police academy and believed "law enforcement is more prepared to be credible when testifying," which counsel understood to mean that B.P. "thought police were more credible."

The district court denied the challenge because, considering the full voir dire, B.P. "always expressed that he could be fair." Counsel did not use a peremptory challenge on B.P., and he served on the jury.

### C. The District Court Did Not Abuse Its Discretion by Denying Johnson's Challenge for Cause to Juror B.P.

¶ 15    Johnson contends that the district court abused its discretion by denying his challenge for cause to Juror B.P. because "B.P.'s statements revealed that he could not apply the credibility instruction equally to lay and law enforcement witnesses" and would assume that police officers were more credible. We disagree.

¶ 16    True, a juror who indicates that police officers are more credible simply because of their position may be unable to render an impartial verdict. *People v. Sandoval*, 733 P.2d 319, 321 (Colo. 1987). And we acknowledge that B.P. apparently raised his hand when defense counsel asked whether anyone thought police officers were more credible. But we do not read B.P.'s actual responses as reflecting a belief that police officers are inherently more credible.[3]

---

[3] Johnson argues that B.P. "could not apply the credibility instruction equally to lay and law enforcement witnesses," but no one asked B.P. about the credibility instruction or whether he would judge the credibility of a lay witness differently than a law enforcement witness.

8

¶ 17    Instead, B.P. indicated that officers are better prepared to testify because everything they do is documented or recorded in some way.  B.P. said he would assess an officer's testimony based on their individual experience.  And he said he believed he could be fair to both sides, which the court credited.  *See id.* ("It is the trial court's prerogative to give considerable weight to a potential juror's statement that [they] can fairly and impartially serve on the case."); *Oliver*, ¶ 11 ("In determining whether a potential juror can set aside any preconceived notions and render an impartial verdict, the trial court may consider a juror's assurances that [they] can serve fairly and impartially.").  Considering the entire voir dire, *see Oliver*, ¶ 7, we conclude that the district court did not abuse its discretion when it determined that B.P. would follow the law and be impartial, *see Clemens*, ¶ 15.

¶ 18    We are not persuaded otherwise by Johnson's argument that B.P.'s expression of impartiality should be discounted because it preceded his statements about police officer credibility and because no one rehabilitated B.P. after defense counsel's questioning.  There was no need for rehabilitation because none of B.P.'s statements about officers reflected an "automatic acceptance" of their testimony

9

based solely on their status. *Sandoval*, 733 P.2d at 321; *see People v. Garcia*, 2018 COA 180, ¶ 22 (the trial court was not required to inquire further when the juror unequivocally stated he would follow the law as instructed).

¶ 19 Given the substantial deference we afford the district court, we conclude that it did not abuse its discretion by denying Johnson's challenge for cause. *See People v. Cevallos-Acosta*, 140 P.3d 116, 122 (Colo. App. 2005) (the trial court did not abuse its discretion by denying a challenge for cause against a juror who said he would weigh police testimony heavily but also said he wanted to make his judgment based on the facts); *People v. Richardson*, 58 P.3d 1039, 1043 (Colo. App. 2002) (upholding the trial court's denial of a challenge for cause against a juror who had friends and family in law enforcement and said he would "possibly" believe law enforcement witnesses more, but who ultimately said "that both sides would get a fair trial from him," because the "entire voir dire of this potential juror . . . support[ed] a finding that the juror would be impartial"); *see also People v. Fleischacker*, 2013 COA 2, ¶ 27 ("It is not necessary that a prospective juror state with absolute certainty that [they] will set aside all potential bias.").

### III. Expert Testimony

¶ 20 Johnson contends that the district court erred by allowing Investigator Spokas to give unqualified expert testimony about (1) Voice over Internet Protocol (VoIP) phone numbers; (2) grooming; (3) the Whisper application; (4) adult fetish websites; and (5) teen slang. We perceive no reversible error.

#### A. Applicable Law and Standard of Review

¶ 21 CRE 701 governs the admission of lay witness testimony, while CRE 702 governs the admission of expert testimony. Under CRE 701, lay witness testimony is limited to "opinions or inferences" that are (1) "rationally based on the perception of the witness"; (2) "helpful to a clear understanding of the witness' testimony or the determination of a fact in issue"; and (3) "not based on scientific, technical, or other specialized knowledge within the scope of [CRE] 702."

¶ 22 "[T]he critical factor in distinguishing between lay and expert testimony is the basis for the witness's opinion." *Venalonzo v. People*, 2017 CO 9, ¶ 22. We "must consider whether the testimony could be based on an ordinary person's experience or knowledge." *People v. Murphy*, 2021 CO 22, ¶ 21. If so, it is proper lay opinion

11

testimony if it meets the requirements of CRE 701. *Id.* at ¶¶ 17, 20. But if a "witness provides testimony that could not be offered without specialized experiences, knowledge, or training, then the witness is offering expert testimony." *Venalonzo,* ¶ 23.

¶ 23    "Police officers regularly, and appropriately, offer testimony under CRE 701 based on their perceptions and experiences." *People v. Tallwhiteman,* 124 P.3d 827, 832 (Colo. App. 2005); *accord Murphy,* ¶ 21. An officer's testimony only "becomes objectionable when what is essentially expert testimony is improperly admitted under the guise of lay opinions." *People v. Stewart,* 55 P.3d 107, 123 (Colo. 2002).

¶ 24    We review a trial court's evidentiary decisions for an abuse of discretion. *People v. Montoya,* 2024 CO 20, ¶ 47. A court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or when it misapplies the law. *Id.*; *Oliver,* ¶ 7.

¶ 25    If the error is preserved by objection, we review it under the harmless error standard and will reverse only "if the error 'substantially influenced the verdict or affected the fairness of the trial proceedings.'" *Hagos v. People,* 2012 CO 63, ¶ 12 (citation omitted). If the error is unpreserved, we review for plain error. *Id.*

12

at ¶ 14. Plain error is both obvious and substantial. *Id.* An error is obvious if it contravenes a statute or rule, a well-settled legal principle, or established Colorado case law, *Campbell v. People*, 2020 CO 49, ¶ 25, and is "'so clear-cut, so obvious,' [that] a trial judge should be able to avoid it without benefit of objection," *People v. Crabtree*, 2024 CO 40M, ¶ 42 (quoting *Romero v. People*, 2017 CO 37, ¶ 6). An error is substantial only if it "so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction." *Id.* at ¶ 43 (citation omitted). The defendant bears the burden of establishing that plain error occurred. *People v. Conyac*, 2014 COA 8M, ¶ 54.

### B. VoIP Testimony

¶ 26 Johnson contends that the district court erred by allowing Investigator Spokas to testify that Johnson used a VoIP phone number and that such phone numbers are "untraceable." We see no reason to reverse.

¶ 27 Notably, Johnson failed to object to most of the testimony he now challenges on appeal. And, with one exception, when Johnson did object, he objected on different grounds. Thus, this claim of error is largely unpreserved. *See Forgette v. People*, 2023 CO 4,

¶ 21 ("To preserve an issue for appellate review, a party must make a timely objection on the record" that is "specific enough to draw the trial court's attention to the asserted error." (citations omitted)); *People v. Ujaama,* 2012 COA 36, ¶¶ 37-38 (an issue is unpreserved if the objection is made on different or unspecified grounds that would not have alerted the trial court to the issue on review). Ordinarily, we review an unpreserved contention for plain error. *See Hagos*, ¶ 14. But because we conclude that any error was harmless, we treat the whole of Johnson's contention as preserved. *See id.* ("[Plain] error must impair the reliability of the judgment of conviction to a greater degree than under harmless error to warrant reversal.").

### 1.    Additional Background

¶ 28    Investigator Spokas testified during direct examination that Johnson used Voice over Internet Protocol or VoIP applications or phone numbers to video call and text the persona. The investigator explained how to obtain a VoIP phone number and that such numbers only work on Wi-Fi. The investigator noted using a VoIP number "obviously . . . keeps somebody more anonymous" because the number is "not registered to them in any way, shape, or form."

14

The investigator also explained that he decided to arrange an in-person meeting because Johnson was using VoIP "services, or these fake phone numbers that don't come back to anybody." Defense counsel did not object to any of this testimony.

¶ 29 During redirect examination, the prosecutor asked, "The V[o]IPs, the phone numbers that are not linked back to individuals[,] . . . how do you get one of those on your phone?" Investigator Spokas began to answer, "[K]ind of like I said before, you can just go into —" when defense counsel objected, "This is outside the scope. I didn't ask anything about Voice [o]ver Internet Protocol, and he's not an expert in this." The district court overruled the objection. Investigator Spokas explained that a person can obtain a VoIP number from different applications and that the assigned number is not connected to a cellular network and only works on Wi-Fi.

¶ 30 The prosecutor then asked: If a person deleted a VoIP application or was not on Wi-Fi "would those V[o]IP numbers, would you still be able to contact somebody, or would they still be able to receive communication?" The investigator answered, "No, they

cannot —" when defense counsel objected, "Speculation. It's a Rule 702 problem as well, Judge." The court overruled the objection.

### 2. Any Error in Allowing Investigator Spokas' Testimony on VoIP Phone Numbers Was Harmless

¶ 31 We are not convinced that Investigator Spokas' VoIP testimony was expert testimony, but even assuming it was, we conclude that any error in admitting it was harmless. *See Hagos*, ¶ 12.

¶ 32 Investigator Spokas testified generally about VoIP phone numbers, including that someone can obtain one by downloading an app, that they work only over Wi-Fi, and that they allow someone to have a separate number that is "more anonymous" and does not "come back to anybody." He also testified that Johnson used a VoIP phone number to communicate with the persona. But that testimony did not directly prove any element of the charged crimes and had little bearing on Johnson's guilt. Johnson did not contest that he sent sexually explicit text messages to the persona or arranged to meet her; rather, his primary theory of defense was that he believed the persona was an adult engaging in "age play" by pretending to be thirteen. That Johnson used a VoIP number to communicate with the persona did not disprove that belief.

¶ 33 Investigator Spokas also testified that he had been an investigator in the Child Sex Offender Internet Investigations Unit for five years, went through a testing and selection process to become part of the unit, and studied social media applications. He said that his work was "geared towards social media, protecting kids online," and that the unit also provided "technology safe presentations" at schools. Based on Investigator Spokas' background and training, he likely would have been qualified to testify as an expert regarding VoIP phone numbers had he been offered as one. *See Conyac*, ¶ 67 (any error in admitting unqualified expert testimony was harmless, in relevant part, because the witness was qualified to offer expert testimony). Investigator Spokas' testimony was also helpful to the jury and likely would have satisfied CRE 702, which allows for the admission of qualified expert opinion testimony if it will assist the trier of fact to understand the evidence or to determine a fact in issue. And Johnson does not argue that the prosecution's failure to endorse the investigator as an expert hindered his ability to cross-examine the investigator effectively or to obtain his own competing expert. *See Conyac*, ¶ 69.

17

¶ 34    Accordingly, we conclude that any error by the district court in admitting the VoIP testimony as lay testimony was harmless as it did not substantially influence the verdict or impair the fairness of the trial.  *See Zapata v. People*, 2018 CO 2, ¶ 62; *see also Pernell v. People*, 2018 CO 13, ¶ 22 ("[A]n objected-to trial error is harmless if there is no reasonable possibility that it contributed to the defendant's conviction.").

## C.    Grooming Testimony

¶ 35    Johnson contends that the district court erred by allowing Investigator Spokas to testify about common grooming behavior for a person who commits sexual assault on children.  We perceive no plain error.

### 1.    Additional Background

¶ 36    During cross-examination, defense counsel asked Investigator Spokas about a few of the messages between the persona and Johnson.  Counsel read aloud Johnson's message that he was "looking for someone to fuck," and the persona's response, "[I]f we vibe, I'd be down."  Counsel asked the investigator what he "intend[ed] to convey by saying, if we vibe."  Investigator Spokas responded, "That's common vernacular that's used with teenagers

18

that basically means, if we get along." Later, when questioning the investigator about Johnson arranging to meet the persona for lunch, counsel asked, "[S]o the point was, the first step in whatever was going to occur here, was to meet for lunch to see if you vibed, and if you got along with Mr. Johnson?" The investigator responded affirmatively.

¶ 37 During redirect examination, the prosecutor asked Investigator Spokas if, "in [his] experience, [it is] common that people engage in forming friendships or grooming activities," to which the investigator stated, "Very often. Yes." The prosecutor continued, "Does that include buying someone food or gifts or something like that?" The investigator said, "Yes." Defense counsel objected that the testimony was "[o]utside the scope." After an off-the-record bench conference, the district court sustained the objection in part. The prosecutor then asked the investigator, "And so, in your experience on some of these websites and sexual conversations, is it common to engage in relationship-building or vibing, if you will, or activities like buying lunch, that sort of thing?" Investigator Spokas answered, "Yes." Defense counsel did not object.

19

## 2. The District Court Did Not Plainly Err by Allowing the Challenged Testimony

¶ 38 As a threshold matter, we agree that Investigator Spokas' testimony about grooming behavior was unqualified expert testimony. *See Romero*, ¶ 10 ("[A]n ordinary citizen could not be expected to be familiar with sexual predators' strategies . . . ."). But Investigator Spokas testified about grooming *before* defense counsel's "[o]utside the scope" objection. The court partially sustained the objection, and the prosecutor rephrased her question to focus on "relationship-building" and "vibing." Defense counsel did not object again, nor did he ask for further relief regarding the testimony that preceded his objection. *See People v. Alemayehu*, 2021 COA 69, ¶ 101 (declining to consider an alleged error when the trial court effectively sustained the defendant's objection by ordering the prosecutor to rephrase, and defense counsel requested no additional relief).

¶ 39 Notably, defense counsel explored the topic of "vibing" on cross-examination. Defense counsel repeatedly asked the investigator about the messages between Johnson and the persona arranging to have lunch to check if they "vibed." And but for the

20

single reference to "grooming" — which was not repeated after defense counsel's objection was sustained — the prosecutor's redirect questions and the investigator's answers were appropriately responsive to cross-examination. On this record, we cannot conclude that the challenged testimony was obviously unqualified expert testimony that the district court should have sua sponte disallowed. *See Crabtree*, ¶ 42; *Campbell*, ¶ 25.

### D. Other Challenged Testimony

¶ 40 Johnson contends that the district court plainly erred by allowing Investigator Spokas to testify that (1) it was "apparent" that there were minors on the Whisper application; (2) there are adult-only role play and fetish websites that confirm a user's age; and (3) the slang terms he used as the persona are "frequently used" by teens. We perceive no error, let alone plain error.

### 1. Additional Background

¶ 41 Investigator Spokas testified that the Whisper application had no requirements to prove identity or age before signing up and that the age options a user could choose ranged from fifteen years old to forty-five and older. During redirect examination, the prosecutor asked the investigator if, based on his experience, the Whisper

application had users under the ages of seventeen and fifteen. Investigator Spokas answered, "Yes." The prosecutor then asked if it was "apparent that there are users under the age of [seventeen] on the app." The investigator answered affirmatively "based on other users who have started conversations with our teen personas" who "turn[] out to be a real [fifteen year old]." The investigator later testified that there are websites specifically "designed for adults with role play or fetishes that require credit card payment and [identification] confirmation[]." Defense counsel did not object.

¶ 42 Investigator Spokas also testified about various slang terms he used when posing as the persona and about how teenagers commonly used those terms. For example, the investigator explained that "lol" meant "[l]augh [o]ut [l]oud, or [l]aughing [o]ut [l]oud," "rn" meant "right now," "asf" meant "as fuck," "omg" meant "oh my god," "tryna get done" meant "trying to get done," and "sum" meant "something." Defense counsel did not object.

### 2. The District Court Did Not Plainly Err by Allowing the Challenged Testimony

¶ 43 We acknowledge that Investigator Spokas had training in investigating child sex offenses on the internet that likely included

the topics about which he testified, but that does not mean the challenged testimony was so outside the experience or knowledge of an ordinary person that it obviously constituted expert testimony. *See Murphy,* ¶ 21; *Venalonzo,* ¶ 22.

¶ 44    Investigator Spokas' testimony that it was "apparent" there were minors on the Whisper application was based on his observations using the application.  Any ordinary person could use the Whisper application, interact with a user, and provide the same testimony.  *See People v. Glover,* 2015 COA 16, ¶ 52 (detective's testimony about Facebook was not expert testimony because it was based on knowledge "common among ordinary people using . . . Facebook").  Similarly, given the widespread use of the internet, one does not need specialized training or experience to know that there are fetish websites for adults that require age confirmation.  *See id.* Because the challenged testimony could be based on an ordinary person's experience or knowledge, the court did not err by admitting it as lay testimony.  *See Murphy,* ¶ 21.

¶ 45    Likewise, the investigator's testimony about teen slang terms did not require special training or knowledge.  Most of the referenced abbreviations and acronyms are well known; many have

23

become part of the common vernacular. *See, e.g.*, Merriam-Webster Dictionary, https://perma.cc/KMX5-Y4E6 (defining "LOL" as "laugh out loud; laughing out loud"); Merriam-Webster Dictionary, https://perma.cc/Y6V7-NJ75 (defining "OMG" as "oh my God"); Merriam-Webster Dictionary, https://perma.cc/YK8X-NKU5 (defining "tryna" as "used for 'trying to' in informal speech"). And others are easily discernable from the context of the messages. *See Glover*, ¶ 53 (the meaning of "street slang" was ascertainable from the context in which it was used); *People in Interest of D.I.*, 2015 COA 136, ¶ 29 (If "an officer's opinion could be reached by an ordinary person based on a process of reasoning familiar in everyday life, it is admissible as lay opinion evidence." (citation omitted)). An ordinary person who interacts with a teenager or uses text messaging to communicate could testify as Investigator Spokas did. Accordingly, the court did not err by admitting the testimony as lay testimony. *See Murphy*, ¶ 21.

## IV. Prosecutorial Misconduct

¶ 46 Johnson contends that the district court plainly erred by allowing the prosecutor to use his post-arrest silence to imply his guilt in violation of his due process rights. We disagree.

24

### A. Applicable Law and Standard of Review

¶ 47 Every person has a constitutional right to remain silent during police questioning. *See* U.S. Const. amend. V; *Miranda v. Arizona*, 384 U.S. 436, 460-61 (1966). Before a custodial interrogation, police must inform a suspect "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444. "A person is in custody for *Miranda* purposes if [he] has been formally arrested or if, under the totality of the circumstances, a reasonable person in the suspect's position would have felt that [his] freedom of action had been curtailed to a degree associated with formal arrest." *People v. Garcia*, 2017 CO 106, ¶ 20. It is improper for a prosecutor to allude to a defendant's exercise of his right to remain silent "as indicating a consciousness of guilt," *People v. Wright*, 511 P.2d 460, 462 (Colo. 1973), "because the *Miranda* warnings implicitly assure the defendant that his silence will carry no penalty," *People v. Davis*, 312 P.3d 193, 198 (Colo. App. 2010) (citing *Doyle v. Ohio*, 426 U.S. 610, 619 (1976)), *aff'd*, 2013 CO 57.

¶ 48    We engage in a two-step analysis when reviewing claims for prosecutorial misconduct. *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010). First, we determine whether the prosecutor's conduct was improper based on the totality of the circumstances. *Id.* Second, we decide whether such actions warrant reversal under the proper standard. *Id.*

¶ 49    We review de novo whether a prosecutor's comments on a defendant's post-arrest silence violated his due process rights. *People v. Castro*, 2022 COA 101, ¶ 20. And because the parties agree that this issue is unpreserved, we will reverse only for plain error. *See Hagos*, ¶ 14. For prosecutorial misconduct to constitute plain error, it "must be flagrant or glaringly or tremendously improper, and it must so undermine the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction." *People v. McMinn*, 2013 COA 94, ¶ 58.

### B.    Additional Background

¶ 50    Investigator Spokas testified that he was working undercover at the restaurant drive-through on the day of the arranged meeting between Johnson and the persona. He said he recognized Johnson in the drive-through as the person from the video chat and alerted

26

the nearby officers, Sergeant Michael Harris and Investigator Vernon Woodin. Once Johnson parked, Sergeant Harris approached the car with his gun drawn and ordered Johnson to step out of the vehicle.

¶ 51 Sergeant Harris' body camera footage, which defense counsel admitted at trial, showed that Johnson did not immediately comply. Investigator Spokas testified that Johnson appeared to be "manipulating" his phone and "deleting or getting rid of . . . the evidence of the communication with [the persona]." The officers eventually removed Johnson from his car and placed him in handcuffs. Johnson did not speak other than to ask, "What's going on?" The arrest lasted forty-four seconds. After Johnson was placed in a police vehicle, he requested a lawyer and did not make any other statements.

¶ 52 At trial, Johnson did not testify, but part of his theory of defense as conveyed through counsel was that he did not believe he was speaking to an actual child; rather, he "love[d] ageplay [sic]." Defense counsel also implied that Johnson was trying to determine if the persona was a scammer. For example, defense counsel asked Investigator Spokas about "scam baiting," which involves "engaging

27

and wasting" a scammer's time. And during closing argument, defense counsel said, "We don't really know, we can't be in the mind, of Sean Johnson. We don't know if he's someone who likes to flesh out scammers on the Internet."

¶ 53 During closing argument, the prosecutor said,

> And when [Johnson is] stopped by law enforcement, he doesn't say ha ha caught you, this was a scam. He doesn't say, I thought she was an adult. He starts deleting things off of his phone. Because this is who he knew he was talking to. And he knew what he was going to do.

C. The District Court Did Not Plainly Err by Allowing the Prosecutor to Comment on Johnson's Post-Arrest Silence

¶ 54 As an initial matter, we reject the People's argument that the prosecutor's comment was about Johnson's silence while the officers were "attempting to arrest" him. *See People v. Rios*, 2020 COA 2, ¶ 24 (explaining that a prosecutor should avoid commenting on a defendant's prearrest silence, but Fifth Amendment protections do not apply in noncustodial settings). The entire interaction beginning with the officers ordering Johnson out of his car until Johnson was in handcuffs was only forty-four seconds. The officers approached Johnson's car with guns drawn and

28

ordered him to get out. Under such circumstances, a reasonable person in Johnson's position "would have felt 'deprived of his freedom of action to the degree associated with a formal arrest'" and would be considered in custody. *People v. Null*, 233 P.3d 670, 676 (Colo. 2010) (citation omitted). Thus, we understand the prosecutor to have commented on Johnson's custodial silence.

¶ 55    To determine whether the prosecutor's comment was meant to draw meaning from Johnson's silence, we consider (1) whether the remark was meant to create an inference of guilt, and (2) whether the prosecutor argued that Johnson's silence was an implied admission of guilt. *See Davis*, 312 P.3d at 198-99. We conclude that the prosecutor's comment on Johnson's custodial silence was intended to suggest his guilt. The remark implied that, if Johnson were innocent, he would have told arresting officers he believed he was exposing a scammer or meeting an adult; conversely, his failure to do so implied his guilt.

¶ 56    We reject the People's argument that the prosecutor's comment was not intended to imply guilt because she "did not argue that if [Johnson] were innocent, he would have explained his defense to officers when he was arrested." The prosecutor need not

29

have so explicitly linked Johnson's silence to his guilt for the comment to have been improper. *See id.* Accordingly, we conclude that the prosecutor committed misconduct.

¶ 57 Having determined that the prosecutor's conduct was improper, we must evaluate whether it warrants reversal under plain error review. *See Wend,* 235 P.3d at 1096; *see also People v. Burnell,* 2019 COA 142, ¶ 45 ("[N]ot every reference to a defendant's exercise of the right to remain silent requires reversal."). We conclude that the misconduct was obvious because the law is well settled that a prosecutor may not use a defendant's post-*Miranda* silence to imply guilt. *See Doyle,* 426 U.S. at 619; *Wright,* 511 P.2d at 462; *People v. Coleman,* 2018 COA 67, ¶ 35. But we also conclude that the misconduct does not require reversal because it did not so undermine the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction. *See Hagos,* ¶ 14.

¶ 58 To evaluate the effect of a prosecutor's comment on a defendant's silence, we examine

> (1) the prosecutor's use of the post-arrest silence; (2) which party elected to pursue the line of questioning; (3) the quantum of other

30

> evidence of guilt; (4) the intensity and frequency of the reference; and (5) the trial court's opportunity to grant a motion for mistrial or to give curative instructions.

*Castro*, ¶ 40.

¶ 59 As discussed, the prosecutor injected the issue into the case and used Johnson's silence to imply his guilt. But the prosecutor made the comment in closing argument in response to the defense theory that Johnson did not think he was talking to a real child or was trying to expose an internet scam. The comment was brief, it was not repeated, and it was not the prosecution's primary argument to establish Johnson's guilt. The district court did not have the opportunity to give a curative instruction because defense counsel did not alert the court to the prosecutor's misconduct. *See Domingo-Gomez v. People*, 125 P.3d 1043, 1054 (Colo. 2005) ("The lack of an objection may demonstrate the defense counsel's belief that the live argument, despite its appearance in a cold record, was not overly damaging." (citation omitted)).

¶ 60 Importantly, the evidence that Johnson committed the charged conduct was overwhelming. The persona told Johnson she was thirteen no less than five times. She also said she was not old

enough to drive and planned to sneak out of middle school to meet him for lunch. Although Johnson discussed age play, he stopped mentioning it once the persona insisted she was thirteen and said she would not meet him if he did not believe her. Johnson told the persona he needed to "be careful on devices others can read" because he did not "want to get in trouble." He sent the persona several sexually explicit messages after she insisted her real age was thirteen. And he made clear what he wanted to do when he met the persona for lunch, telling her that he wanted to "kiss [her], lick [her], fuck [her]," that "sex keeps the weight down," and that he could not "wait to find out how [she] taste[d]."

¶ 61    Considering the *Castro* factors and the record as a whole, reversal is not required. *See McMinn,* ¶ 58; *Hagos,* ¶ 14.

V.    Disposition

¶ 62    We affirm the judgment of conviction.

JUDGE HARRIS and JUDGE TOW concur.